IN RE JUVENILE APPEAL (83-BC)*
(9717)

PETERS, HEALEY, PARSKEY, SHEA and F. HENNESSY, Js.

---

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 3161, the names of the parties involved in this appeal are not disclosed and the records and briefs will not be distributed to the various libraries of the state. The

Argued October 6, 1982—decision released January 18, 1983

*Judith A. Dixon,* for the appellant (mother of the minor child).

*Robert L. Festa,* assistant attorney general, with whom, on the brief, was *Carl R. Ajello,* attorney general, for the appellee (state).

*William A. Conti,* for the minor child.

---

records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Supreme Court.

68

SHEA, J.   The respondent in this action has appealed from the judgment terminating her parental rights in regard to her eleven year old son, T.   The judgment relied upon two of the grounds set forth in General Statutes § 17-43a (a):[2]   "(2)

[2] "[General Statutes] Sec. 17-43a.   TERMINATION OF PARENTAL RIGHTS OF CHILD COMMITTED TO COMMISSIONER.   (a) In respect to any child committed to the commissioner of children and youth services in accordance with section 46b-129, either the commissioner, or the attorney who represented such child in the prior commitment proceeding, or an attorney appointed by the superior court on its own motion, or an attorney retained by such child after attaining the age of fourteen may petition the court for the termination of parental rights with reference to such child, including the right to petition the court for the revocation of the commitment of the child. The superior court upon hearing and notice, as provided in sections 45-61d and 45-61f, may grant such petition upon finding that over an extended period of time, which, except as hereinafter provided in this subsection, shall not be less than one year:   (1) The parents have abandoned the child in the sense that they have failed to maintain a reasonable degree of interest, concern or responsibility as to the child's welfare; or (2) the parents have failed to achieve any such degree of personal rehabilitation as would reasonably encourage the belief that at some future date they could assume a responsible position in their child's life; or (3) the parents, by reason of continuing physical or mental deficiency have, and for such period of time as will be detrimental to the best interest of the child, will be unable to provide him with the care, guidance and control necessary to his physical, educational, moral and emotional well-being; or (4) there is no ongoing parent-child relationship, which means the relationship that ordinarily develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child; or (5) that both parents, or the sole parent of such child have consented to termination of parental rights with respect to such child. The court may waive the requirement that one year expire prior to the termination of parental rights if it finds from the totality of the circumstances surrounding the child that such a waiver is necessary to promote the best interest of the child."

the parents have failed to achieve any such degree of personal rehabilitation as would reasonably encourage the belief that at some future date they could assume a responsible position in their child's life; or (3) the parents, by reason of continuing physical or mental deficiency have, and for such period of time as will be detrimental to the best interest of the child, will be unable to provide him with the care, guidance and control necessary to his physical, educational, moral and emotional well-being . . . ." The respondent claims that there was insufficient evidence before the court to support the termination order on either basis cited by the court. We have concluded that the evidence does support the adjudicatory portion of the termination order on the second of those grounds, continuing mental deficiency, as provided in § 17-43a (a) (3). Because the grounds for termination under the relevant statute are listed in the alternative, this conclusion makes it unnecessary to address the trial court's determination that the respondent had failed to achieve a sufficient degree of personal rehabilitation as provided in § 17-43a (a) (2). We find no error in the court's interpretation and application of § 17-43a (a) (3).

In rendering judgment, the court accepted the findings of the referee to whom the matter had been referred.[3] Taking judicial notice of proceedings prior to the termination hearing, the referee found the following: When neglect proceedings were ini-

---

[3] The state petitioned for termination on three grounds. General Statutes § 17-43a (a) (2), (3) and (4). After the referee recommended a decision against the respondent on all three grounds, she filed a motion, entitled inappropriately "motion to dismiss," claiming that the referee's findings of fact and the evidence presented by the state were insufficient to support the referee's conclusions. The trial court denied this motion, but did not accept the referee's

tiated in 1974 the respondent, Mrs. S, as the result of the dissolution of her marriage, had legal and physical custody of her son T, aged three, her daughter B, aged ten, and her son D, aged eleven. T, subject of this proceeding, was removed from his mother and committed to the commissioner of children and youth services after an adjudication by the Juvenile Court that he had been physically abused by Mrs. S and denied adequate emotional nurture in her care. Mr. S, who had remarried, was unable to provide a home for the child at that time. In 1976 an application by Mrs. S for revocation of commitment was denied, the court having concluded that Mrs. S, limited by mental and emotional problems which had not measurably improved with regular therapeutic intervention, could not provide the level of parenting required to care adequately for T, a child with severe developmental problems.

On the basis of the evidence presented at the termination hearing, the referee made additional findings regarding both the child T and Mrs. S. T's ability to relate consistently to his foster parents and psychiatric caseworker had improved since his commitment and he was functioning at a behavioral level which permitted him to be placed in a public school for the 1978-79 school year, rather than in the highly structured private school which he had attended for two previous years. Despite this progress, the court found that T, with his devel-

___

conclusion that the state had demonstrated the lack of an ongoing parent-child relationship as required by General Statutes § 17-43a (a) (4). The referee also recommended the termination of the parental rights of Mr. S to his son under § 17-43a (a) (4), the only ground pressed against him by the state at the time of the hearing. Mr. S consented to the termination of his rights after the referee's decision was announced.

opmental problems, had exhausted the mental and emotional resources of two sets of motivated and competent foster parents and was certain to bring a high degree of stress to any living situation. His conduct, characterized by rapid mood swings calculated to elicit retaliatory responses from an adult insensitive to his needs, required parents with above average insight and understanding, who could work in cooperation with professional assistance from outside agencies. T intermittently denied the existence of his biological parents, though he saw both of them with relative frequency. He displayed no deep emotional attachment to his mother, despite her biweekly visits with him. Nevertheless, when interviewed by the referee, he expressed a preference, if change were coming, for living with his mother.

Mrs. S was found to have continuing mental and emotional problems for which she had been receiving psychiatric treatment once a month at a hospital, prescribed medication, and biweekly home visits from a regional health nurse. She had, however, adequately provided physical care for her two older children within the constraint of a small income provided by disability and aid to dependent children grants. In considering the entire family structure, the referee accepted expert testimony that the adjustment of Mrs. S and her family was marginal and could be undermined easily by additional stress. The fourteen year old daughter B recently had been admitted to a hospital with strapmarks from a whipping Mrs. S had inflicted with a piece of belt when the child had refused to stop screaming after accidentally burning her arm while baking cookies. Since T's commitment, Mrs. S had regularly arranged for visits on alternate Satur-

days, either in the foster homes or currently at her own home. She was unable, however, to see any change in her son during his years of placement in foster homes and displayed no understanding of the difficulties she would face if T returned to her care.

The referee found that the ability of Mrs. S to provide parental care was limited by her continuing mental and emotional problems. Despite the treatment and other assistance she was receiving, her resources were sometimes stretched beyond their limits in caring for the two older children and she could not realistically be expected to fulfill T's needs. The referee concluded that the state had proved by clear and convincing evidence[4] that the respondent was suffering from a continuing mental deficiency which rendered her unable to provide her son T with the care, guidance and control necessary to his well-being as required by § 17-43a (a) (3).

I

In order to terminate the parental rights of the respondent under § 17-43a (a) (3) the state was required to prove by clear and convincing evidence (1) that she suffered from a "continuing physical or mental deficiency" and (2) that, by reason of this condition, she had been and would, for such a period of time as would be detrimental to the best interest of the child, be unable to furnish him with the necessary care, guidance and control. See *Anonymous* v. *Norton,* 168 Conn. 421, 429, 362 A.2d

[4] Although the decision in *Santosky* v. *Kramer,* 455 U.S. 745, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982), was not announced until after the trial of this case, the referee expressly found that the allegations of the petition in respect to Mrs. S had been established by evidence meeting the "clear and convincing" standard of proof required as a matter of constitutional law for the termination of parental rights. See *Santosky* v. *Kramer,* supra, 769–70.

532, cert. denied, 423 U.S. 935, 96 S. Ct. 294, 46 L. Ed. 2d 268 (1975); *In re Nunez*, 165 Conn. 435, 439, 334 A.2d 898 (1973). In regard to the first element, there can be no serious question of the adequacy of the evidence that the respondent suffered from a continuing mental deficiency. When the testimony of the psychiatrist who had treated her for an extended period of time was ruled inadmissible, the court appointed another psychiatrist to make an examination. The report of this psychiatrist, which was admitted into evidence, indicated that Mrs. S had experienced two "mental breakdowns" about twenty-six years earlier, for each of which she was hospitalized for several weeks. During one of these confinements she received shock treatments. Following T's birth, about seven years before trial, she suffered another "breakdown" for which she was hospitalized three weeks. Since then she had been receiving medication for her mental condition and was seen by a psychiatrist each month. Her medical history indicated that she had been diagnosed as suffering from chronic undifferentiated schizophrenia. During the examination, impairment of recent and remote memory was evident. Her thought processes were slow, simple, and very concrete, although there was no evidence of thought disorder. Frequently she did not understand questions asked by the examiner. She had left school at the age of sixteen while she was in the seventh grade. She had a fair amount of knowledge considering her education but had difficulty doing calculations. The diagnosis of the examining psychiatrist was (1) inadequate personality; (2) probable borderline intelligence; and (3) chronic undifferentiated schizophrenia. The report also recommended further testing to rule out a mild organic brain syndrome which some of the respond-

ent's symptoms suggested. We find no merit in the claim of the respondent that the examination conducted by the court appointed psychiatrist was inadequate to justify the conclusions reached in regard to her mental condition or that the court could not reasonably rely upon the opinion of this expert.[5]

The second element required for termination under § 17-43a (a) (3) involves the relationship between the mental deficiency and the ability of the parent to care for the particular child who is the subject of the proceeding. The referee found that the respondent's mental deficiency prevented her from achieving the level of parenting ability necessary to respond to the needs of her son. The respondent challenges the sufficiency of the evidence

---

[5] Two personal interviews with Mrs. S, a brief interview with the two older children, and various records of both Mrs. S and T formed the basis for the expert testimony offered by the court appointed psychiatrist. The psychiatrist met with Mrs. S once for one and one-quarter hours and again for one and one-half hours. This court has recognized that length of examination alone does not necessarily detract from the reliability of testimony. *Seymour* v. *Seymour*, 180 Conn. 705, 713, 433 A.2d 1005 (1980). Rather, the credibility of the expert opinion is to be evaluated in light of the expert's opportunity to arrive at a reasoned conclusion. Id., 712. Among the records examined were a 1975 psychiatric examination of Mrs. S, a 1975 and 1977 developmental examination of T, a 1975 clinical report and a 1976 psychological examination of T by a children's hospital, a 1977 psychiatric evaluation of Mrs. S and T, a 1979 school psychological report on T, a 1979 psychiatric report on T from another hospital, and a department of children and youth services (DCYS) case summary of T from 1977 to 1979. These reports were a proper basis for expert opinion on psychiatric matters in addition to the interviews, because such reports are commonly relied upon within the profession. *State* v. *Cuvelier*, 175 Conn. 100, 107–108, 394 A.2d 185 (1978). Also, "where such evidence is admitted without objection, it may properly be considered for whatever it is worth on its face in determining the facts in issue." Id., 108. The respondent made no objection to the testimony of the court appointed psychiatrist or to the introduction of her report in evidence.

to support this finding, but it is clear that several witnesses, whose qualifications were never questioned, expressed the same opinion. The report of the examining psychiatrist stated that the low intelligence of the respondent affected her judgment, capacity for insight and ability to empathize with T, to understand the complexities of his behavior, to seek appropriate solutions, and to provide him with the intellectual stimulation he needs; that she suffered from extreme emotional impoverishment and a sense of neediness; that she would not be able to satisfy this very needy child and she might retaliate with abuse; that returning T was likely to set up an intolerable and explosive situation; and that her psychiatric history suggested limited tolerance for stress, and her blunted affect and slow thought processes, most likely the result of chronic schizophrenia, further impair her capacity to relate to others, especially a child. The social worker who investigated the case reported that the psychiatrist who had been treating Mrs. S diagnosed her as "schizophrenic," "a long term disabled person," and "a totally inadequate person who relates poorly."[6] This doctor felt very strongly that she would be unable to relate to T emotionally and meet his needs. The staff at the hospital where Mrs. S was being treated felt that their attempts to teach parenting and related skills to Mrs. S had failed because she had not gained any insight into her own behavior and saw no need to improve her way of relating. The social worker expressed the view that Mrs. S was an inadequate, passive person

---

[6] No objection to this hearsay evidence was raised at the trial nor has the respondent claimed it as a basis for error. "Hearsay evidence admitted without objection, if believed by the court, is a sufficient basis for a finding of fact." *DeGroat* v. *DeGroat,* 171 Conn. 363, 370 A.2d 963 (1976).

who lacked the capability of consistently interacting and stimulating a depressed, withdrawn child and could not handle T under stressful situations. Mrs. S had said that even during her visits with T he ignored her and did not listen to her.

Faced with this plenitude of expert testimony in support of the conclusion reached by the referee, the respondent points to testimony about the strong bond of mutual affection which existed between her and T. She claims that few parents could be expected to provide the "extraordinary level of parenting" which the referee found T required and that she should not be penalized for his deficiencies. It is quite clear, however, that the referee found Mrs. S to be a substandard parent, whose "restricted mental, emotional and judgmental resources . . . are presently stretched to and sometimes beyond their outermost limits by her efforts to guide and discipline" her two other children. The reference to T's exceptional needs merely emphasizes the breadth of the gap between her marginal capability and his requirements. Under § 17-43a (a) (3) the court must consider, once mental deficiency has been determined, whether such disability makes a parent incapable of adequately responding to the needs of the particular child involved.

The respondent also challenges the refusal of DCYS to extend the visitation periods, as she had requested, in order to allow an opportunity for a more viable mother-son relationship to develop and to verify the prognostications of professionals by actual experience. A decision against overnight visitation had been made after a psychiatric evaluation of Mrs. S in 1975 and was based upon that report as well as the observations of the agency

social worker, who concluded that her condition would not permit such an arrangement. "Psychological testimony from professionals is rightly accorded great weight." *In re Juvenile Appeal (Anonymous)*, 177 Conn. 648, 667, 420 A.2d 875 (1979). The considerations advanced by the respondent are more appropriately addressed to the trier than to our function of appellate review. "[W]e are not in a position to second-guess the opinions of witnesses, professional or otherwise, nor the observations and conclusions of the Juvenile Court when they are based on reliable evidence." Id., 668. We find no error in the conclusion of the referee that the petitioner had proved the ground for terminating the parental rights of the respondent in accordance with § 17-43a (a) (3) by clear and convincing evidence.

The dissenting opinion, *Parskey, J.*, appears to challenge the constitutionality of § 17-43a (a) (3) as a ground for termination of parental rights, at least as we have construed and applied it in this case. *Wisconsin* v. *Yoder*, 406 U.S. 205, 233–34, 92 S. Ct. 1526, 32 L. Ed. 2d 15 (1972), is relied upon for the proposition that "it is only where the child's essential health and safety needs are in jeopardy that the right of the state to override the parental rights is justified." We disagree with such a reading of that decision, which was rendered in a different context, because the passage relied upon[7] speaks

---

[7] The full passage from which the quoted excerpts are taken reads as follows: "To be sure, the power of the parent, even when linked to a free exercise claim, may be subject to limitation under *Prince* [v. *Massachusetts*, 321 U.S. 158, 64 S. Ct. 438, 88 L. Ed. 645 (1944)] if it appears that parental decisions will jeopardize the health or safety of the child, *or have a potential for significant social burdens.* But in this case, the Amish have introduced persuasive evidence undermining the arguments the State has advanced to support its claims in terms of the welfare of the child and society as a whole.

not only of health or safety but also of the "potential for significant social burdens." Id. A further elucidation in the opinion of the criterion for state interference is whether parental control will "impair the physical or mental health of the child, or result in an inability to be self-supporting or to discharge the duties and responsibilities of citizenship, or in any other way materially detract from the welfare of society." Id. We see no conflict between these concerns and those contained in the standard for termination established by § 17-43a (a) (3): inability of the parents "by reason of continuing physical or mental deficiency . . . to provide [a child] with the care, guidance and control necessary to his physical, educational, moral and emotional well-being . . . ."

The dissenting opinion, *Parskey, J.,* also seems to take the broader ground that terminating the parental rights of a mentally deficient parent "introduces a concept of no fault termination of parental rights" which penalizes such a parent for his mentally deficient status. Termination of parental rights is ordinarily a necessary prelude to an adoption or other dispositive action to be taken in the best interests of the child. In weighing the interests of the child against the hardship imposed on the parent, the legislature may properly strike the balance at the point where the mental or physical deficiency, even though not involving fault, is

The record strongly indicates that accommodating the religious objections of the Amish by forgoing [sic] one, or at most two, additional years of compulsory education will not impair the physical or mental health of the child, or result in an inability to be self-supporting or to discharge the duties and responsibilities of citizenship, or in any other way materially detract from the welfare of society." (Emphasis added.) *Wisconsin* v. *Yoder,* 406 U.S. 205, 233–34, 92 S. Ct. 1526, 32 L. Ed. 2d 15 (1952).

so great as to render the parent incapable of measuring up to the child's needs as those are delineated in § 17-43a (a) (3).

## II

A finding that a statutory ground for termination has been established does not automatically require the termination of parental rights, because the statute is phrased permissively: "The superior court . . . *may* grant such petition upon finding [one of the five grounds for termination] . . . ." (Emphasis added.) General Statutes § 17-43a. Ordinarily the only purpose served by such a termination is to make a child available for adoption. See *In re Juvenile Appeal (Anonymous),* supra, 673. In the case before us no other objective is suggested by the evidence. Unless there is a realistic prospect for adoption of T, it would make no sense to sever his existing tie to his mother and set him adrift as a permanent ward of the state. In accordance with this consideration the referee recommended that the decree terminating parental rights not enter until the petitioner had satisfied the court that "T will forthwith or within a reasonable time thereafter, and without the necessity of undergoing an interim placement, be placed in adoption . . . ." The trial court, for reasons undisclosed by the record, and without objection from any party, did not follow this part of the recommendation but simply ordered termination without further evidence of the adoptability of T after affirming two[8] of the statutory grounds found by the referee.

Before the referee, a social worker testified that she had found parents who were interested in

[8] See footnote 3, supra.

adopting T even though they were aware of his problems. The recommendation of the referee indicates that he contemplated a further proceeding in which the prospects for adopting T would be explored in greater depth as the central issue. The failure to conduct such a hearing, even though implicitly assented to by counsel, was error on the part of the trial court and leaves a gap in the termination proceeding which must be filled. Because of the passage of more than three years since the judgment, the deficiency may be more difficult to cure than if the additional hearing had been contemporaneous with the judgment. At this point it would be speculative to assume that the same adoptive home is still available or that prospects for the adoption of T have not changed. Other considerations related to the best interests of T, the touchstone of the dispositional phase of the termination proceeding at which we have now arrived; *In re Juvenile Appeal (Anonymous),* supra, 673–74; may also have intervened. These would include any substantial change in circumstances which has occurred during the pendency of the appeal indicating that the ground for termination which we rely upon no longer exists.

Although we have affirmed the conclusion of the trial court in the adjudicatory phase that the statutory ground for termination of the respondent's parental rights under § 17-43a (a) (3) has been proved, we deem it necessary to remand the case for further proceedings as to the prospects for finding an adoptive home for T and for consideration of whether any substantial change has taken place in the condition of Mrs. S or T which has removed § 17-43a. (a) (3) as a present ground for termination. See *Interstate Fur Mfg. Co.* v.

*Redevelopment Agency,* 154 Conn. 600, 604, 227 A.2d 425 (1967). The petitioner, of course, would have the burden of satisfying the court of the current likelihood of the adoption of T and the absence of any such change of circumstances by clear and convincing evidence. *Santosky* v. *Kramer,* 455 U.S. 745, 769-70, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982).

In order to minimize any further delay in the final resolution of this matter and in the exercise of our general supervisory power over appeals; Practice Book § 3096; it is ordered that the further proceedings contemplated by this opinion take place within sixty days from this date. It is further ordered that, if any party shall seek review of the determination made by the trial court at such proceedings within the time allowed for taking an appeal prescribed in Practice Book § 3007, the case shall be returned to this court for such review, without the necessity of filing a formal appeal.

There is error in part, the judgment is set aside except for the adjudication of the existence of the ground for termination specified in General Statutes § 17-43a (a) (3), and the case is remanded for further proceedings in accordance with this opinion.

In this opinion, PETERS and HENNESSY, Js., concurred.

PARSKEY, J. (concurring in part and dissenting in part). The trial court has terminated the parental rights of Mrs. S with respect to T, one of her three children. The trial court's judgment is flawed because the trial referee applied the wrong standard of law. Although in my view a new trial should

be ordered, if the case is to be remanded for a new trial limited to the dispositional stage of the termination proceeding, I agree with the court's opinion in this respect.

General Statutes § 17-43a provides, inter alia, for the termination of parental rights upon a finding that "(3) the parents, by reason of continuing physical or mental deficiency have, and . . . will be unable to provide [the child] with the care, guidance and control necessary to his physical, educational, moral and emotional well-being . . . ." "The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child . . . ." *Santosky* v. *Kramer*, 455 U.S. 745, 753, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982). Before the state may intervene for the purpose of terminating the parents' fundamental liberty interest in the parent-child relationship, the need for such intervention must be compelling. *In re Juvenile Appeal (Anonymous)*, 177 Conn. 648, 671, 420 A.2d 875 (1979). To satisfy this need it must appear that the parents' actions or failure to act will jeopardize the child's health or safety. *Wisconsin* v. *Yoder*, 406 U.S. 205, 233–34, 92 S. Ct. 1526, 32 L. Ed. 2d 15 (1972).[1] Although the statute does

---

[1] Because *Wisconsin* v. *Yoder*, 406 U.S. 205, 92 S. Ct. 1526, 32 L. Ed. 2d 15 (1972), involved the question of whether Wisconsin's compulsory school-attendance law trenched upon the first amendment right of parents to direct the religious education of their children, the court also discussed the issue of the state's intrusion into the parental area in relation to the potential for significant social burdens. If such social burdens are pecuniary in nature they cannot be regarded as significant in a termination proceeding. See *Lassiter* v. *Department of Social Services*, 452 U.S. 18, 28, 101 S. Ct. 2153, 68 L. Ed. 2d 640, reh. denied, 453 U.S. 927, 102 S. Ct. 889, 69 L. Ed. 2d 1023 (1981).

not define the standard of care required, since the failure to meet the requisite standard could result in a loss of a fundamental constitutional right the statute must be construed strictly to mean the minimum standard below which there is a substantial risk that the health and well-being of the child will be jeopardized; it is only where the child's essential health and safety needs are in jeopardy that the right of the state to override the parental rights is justified. *Wisconsin* v. *Yoder,* supra; *In re William L.,* 477 Pa. 322, 339, 383 A.2d 1228 (1978).

Although Mrs. S does have psychiatric problems, not only has she tended to them by maintaining regular contact with her psychiatrist but, equally important, there is no finding that these problems have impaired her ability to take care of her other two children. To the contrary, the referee found that her "handling of the mechanics of homemaking such as budgeting, meal preparation, and the physical care of herself, the children and the apartment has been satisfactory." She has also demonstrated a normal maternal interest in T. Not only has she sought to have her custody of him restored but she has also maintained contact with him through regular visitation. Although T may not feel a deep emotional attachment to his mother, the fact that, after living with highly regarded foster parents over the years, he still expresses a preference for living with his mother is significant. The trial referee did not find that Mrs. S was or would be unable to provide T with minimum care. Mrs. S's failure, in the trial referee's opinion, consisted of an inability to provide an "extraordinary level of parenting." The referee found that T "needs a permanent home which will at long last

bring him stability [of] living; and that this goal in the light of T's problems is achievable only by parents who possess something beyond average insight and understanding,[2] who can, against a backdrop of unceasing love, balance patience with control, and who are willing to invest the time to offer him stimulation within the home while working cooperatively with outside help." Measured against that standard few of us would qualify. Certainly not the foster parents.

Between 1974 and 1979 T has lived in four foster homes. The fourth home, where T has lived for almost three years, has been described as excellent. Nevertheless, the foster parents have asked to be relieved of what they have described as a substantial and tiring commitment. Thus far none of the foster parents has been able to satisfy T's need for an extraordinary level of parenting and there is nothing in the record to indicate that any such parent is in sight. To expect Mrs. S to be "wonder woman" on pain of losing her parental rights is expecting the impossible. We are, thank God, a nation of mere mortals and therefore we should be judged accordingly. Neither the constitution nor the parental termination statute demands of the least of us what is achievable only by the best of us. The trial referee, in measuring Mrs. S's ability

---

[2] In view of the above finding and the further findings that T's "extraordinary needs have exhausted the parenting capabilities over the past four years of two motivated and competent sets of foster parents" and that his "functioning bespoke a need for an extraordinary level of parenting well beyond that which Mrs. S could hope to offer" with her mental and emotional limitations, for the majority to take the position that this is simply a case of a substandard parent who could not satisfy the normal needs of an average child is, to say the least, curious.

against T's extraordinary needs, impermissibly substituted a standard of desirability for one of essentiality.

Finally, a word about the implications of the majority's approval of the ground for termination in this case. It introduces a concept of no-fault termination of parental rights based on a judicial assumption of parental inadequacy of mentally deficient parents. Note, "Retarded Parents in Neglect Proceedings: The Erroneous Assumption of Parental Inadequacy," 31 Stan. L. Rev. 785, 791 (1979). Although a person may not be penalized for mere status; *Powell* v. *Texas,* 392 U.S. 514, 88 S. Ct. 2145, 20 L. Ed. 2d 1254 (1968) (public drunkenness); *Robinson* v. *California,* 370 U.S. 660, 82 S. Ct. 1417, 8 L. Ed. 2d 758 (1962) (drug addiction); to deprive a person of her parental rights merely because of her physical or mental condition achieves the same result. The loss of a child is " 'as onerous a penalty as the deprivation of the parents' freedom.' " *Department of Public Welfare* v. *J.K.B.,* 379 Mass. 1, 3, 393 N.E.2d 406 (1979). It speaks loud and clear to the poor, the powerless and the helpless. It says to the handicapped, both of body and of spirit, that if they are not affluent enough to avoid governmental intrusion into their family affairs their parental rights are at the mercy of governmental institutions. "The welfare of many children might be served by taking them from their homes and placing them in what the officials may consider a better home. But the Juvenile Court Law was not intended to provide a procedure to take the children of the poor and give them to the rich, nor to take the children of the illiterate and give them to the educated, nor to take the children of the crude and give them to the cultured, nor to take the chil-

dren of the weak and sickly and give them to the strong and healthy." *Rinker Appeal,* 180 Pa. Super. 143, 148, 117 A.2d 780 (1955). "By its indifference to law and sound judicial caution, the majority has [potentially] terminated the parental rights of a mother who did all she could with the few natural attributes that God gave to her." *In re William L.,* 477 Pa. 322, 363, 383 A.2d 1228 (1978) (Nix, J., dissenting).

Accordingly I dissent from the court's holding that the petitioner has established a sufficient basis for terminating Mrs. S's parental rights in T on the ground of mental deficiency.

ARTHUR H. HEALEY, J. (dissenting). I write separately in dissent to articulate my disagreement with the majority's disposition of this appeal in remanding as they have after they have affirmed the trial court's conclusion that the statutory ground for termination of the respondent's parental rights under § 17-43a (a) (3) has been proven. After affirming this conclusion, the majority goes on to say that the referee *recommended* that the decree terminating parental rights not enter until the petitioner has satisfied the court that "T will forthwith or within a reasonable time thereafter, and without the necessity of undergoing an interim placement, be placed in adoption." They then indicate that the trial court, "for reasons undisclosed by the record, and without objection from any party, did not follow this part of the recommendation but simply ordered termination without further evidence of the adoptability of T . . . ." The failure of the trial court to conduct the hearing to explore the prospects for an adoption of T, the majority says, "leaves a gap in the termination proceedings which must be filled." Furthermore,

the fact that the hearing has not been held although three years have passed since the judgment was rendered; speculation that the same adoption home may not be available or that T's prospects for adoption have not changed; and "[o]ther considerations related to the best interests of T" are thus said to impel the remand ordered by the majority. One of these "other considerations" that may have intervened since the judgment is said to "include any substantial change in circumstances which has occurred during the pendency of the appeal indicating that the ground for termination which we rely upon no longer exists."

The "prospect for adoption" hearing cannot be concurrent with any hearing clearly encompassed by the majority opinion that authorizes the new "termination" proceeding. I am concerned because we have only recently said that "[i]t is thus essential, in considering a petition to terminate parental rights, to sever completely the issues of whether termination is statutorily warranted and whether a proposed adoption is desirable." *In re Juvenile Appeal (Anonymous)*, 177 Conn. 648, 673, 420 A.2d 875 (1979). I find this compatible with our statement in *In re Juvenile Appeal (Anonymous)*, 181 Conn. 638, 645, 436 A.2d 290 (1980), where we said: *"Only* if a ground for termination exists may the suitability and circumstances of adoptive parents, *in an appropriate proceeding,* be considered."[1] (Emphasis added.) This may well have been what the trial judge had in mind when he decided, as he

---

[1] I do not agree that the trial judge committed error in not holding the recommended "prospect for adoption" hearing. It follows that I do not consider the action ordered on the remand, because of the holding of the majority, to be "an appropriate proceeding" for such an adoption hearing.

had the right to, not to have a hearing contemplated by the referee exploring the prospects for adopting T.

I am also troubled, however, both by that portion of the remand which sends the matter back for "consideration of whether any substantial change has taken place in the condition of Mrs. S or T which has removed § 17-43a (a) (3) as a present ground for termination" and by signals in the opinion on this directive. No authority, statute, case or rule is cited to justify this.[2] The petitioner commissioner has already been found by the majority to have proven a statutory ground for termination under § 17-43a (a) (3) and this, I submit, after a scrupulous regard by the trial court, the referee and counsel of the rights and responsibilities of all the interests involved in this matter.

The majority refers to no authority for this new "termination" hearing. A complete termination

---

[2] The majority refers to *Interstate Fur Mfg. Co.* v. *Redevelopment Agency,* 154 Conn. 600, 604, 227 A.2d 425 (1967). In *Interstate,* the judgment appealed from did *not* direct final distribution (of certain monies received in the redevelopment condemnation award involved) because interest was running on the fund on deposit. We decided, therefore, to remand the case for a determination of the exact amounts then due the claimants on the fund in the order of priority as determined by the report of the referee and the judgment of the court, which we affirmed. That case cannot survive analysis, for the proposition suggested, as any real authority in this case where the final judgment was one of final termination of parental rights, where the parties sought the affirmance or reversal of the judgment of termination and where that is the thrust of the briefs filed, where no one, either by preliminary statements of issue or by brief, challenges the trial judge's "failure" to hold the hearing on T's adoption prospects, and clearly do not ask or argue for this potential "substantial change" hearing on termination, clearly signaled in the remand. Moreover, I am puzzled how the judgment can be vacated "except for" the very adjudication which is *the* only thing adjudged in the trial court.

hearing under the statute has already taken place; no statutory or constitutional infirmities are even suggested in that determination,[3] and, significantly, the majority finds none. This second "termination" proceeding is not provided for by the statutory scheme which includes § 17-43a.

The judicial gloss impressed on this statutory scheme by the majority smacks of legislation and of excursion into the realm of public policy. The legislature left little, if any, question about what it meant in this statutory scheme by "termination of parental rights." General Statutes § 17-32d. Section 17-32d provides that "[t]ermination of parental rights means the complete severance by court order of the legal relationship, with all its rights and responsibilities, between the child and his parent or parents so that the child is free for adoption except it shall not affect the right of inheritance of such child or the religious affiliation of such child . . . ." Specifically, this is the definition the trial judge was *required* to employ in passing upon the commissioner's § 17-43a petition. Yet the majority says there is no "complete severance" but that there is to be a new "termination" hearing. The legislature has spoken; the statute says absolutely nothing, expressly or by fair implication, of anything but a "complete severance" of all rights and responsibilities. This definition does not confer upon the courts any license to go beyond the statutory language in this delicate and sensitive area. The state has a substantial range of authority to protect

---

[3] Although this case in the trial court was decided before the decision in *Santosky* v. *Kramer*, 455 U.S. 745, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982), was released, the referee applied the "clear and convincing" evidence constitutional test later mandated by that opinion. *Santosky* v. *Kramer*, supra, 769–70.

the welfare of children; *Prince* v. *Massachusetts,* 321 U.S. 158, 168, 64 S. Ct. 438, 88 L. Ed. 645, reh. denied, 321 U.S. 804, 64 S. Ct. 784, 88 L. Ed. 1090 (1944); and the state's legitimate interest in a child's welfare may be implemented by separating the child from his parent. *Stanley* v. *Illinois,* 405 U.S. 645, 649–50, 92 S. Ct. 1208, 31 L. Ed. 2d 551 (1972). "[C]ourts do not substitute their social . . . beliefs for the judgment of legislative bodies, who are elected to pass laws." *Ferguson* v. *Skrupa,* 372 U.S. 726, 730, 83 S. Ct. 1028, 10 L. Ed. 2d 93 (1963); see *Dupont* v. *Planning & Zoning Commission,* 156 Conn. 213, 220, 240 A.2d 899 (1968). This legislative determination must be given great deference because "when an issue involves policy choices as sensitive as those implicated by [the involuntary termination of parental rights], the appropriate forum for their resolution in a democracy is the legislature." *Maher* v. *Roe,* 432 U.S. 464, 479, 97 S. Ct. 2376, 53 L. Ed. 2d 484 (1977). In *Maher* v. *Roe,* supra, 480, the United States Supreme Court pointed out Justice Holmes' declaration in *Missouri, Kansas & Texas Ry. Co.* v. *May,* 194 U.S. 267, 270, 24 S. Ct. 638, 48 L. Ed. 971 (1904), that "legislatures are ultimate guardians of the liberties and welfare of the people in quite as great a degree as the courts." See *In re Adoption of I.L.G.,* 492 Pa. 507, 512, 424 A.2d 1306 (1981).

The potential imbalance of consequences to the petitioner, the respondent and the child of this remand also concerns me. Under the remand, the petitioner has the "burden of satisfying the court of the current likelihood of the adoption of T and the absence of any such change of circumstances by clear and convincing evidence." This "change of circumstances," it is clear from the majority,

includes not only "the current likelihood of any adoption of T," but also "whether any substantial change has taken place in the condition of Mrs. S or T which has removed § 17-43a (a) (3) as a *present* ground for termination."[4] (Emphasis added.) The petitioner not only again faces a "termination" hearing, but may also face a "prospect of adoption" hearing. Moreover, the confusion of issues of "termination again or not" and "prospect of adoption" are very real. "In the diverse settings in which an adoption may take place, the selection of prospective adoptive parents may often depend upon the ability of the agency to give assurance that the child may be placed for adoption without the necessity of future court proceedings to terminate the right of the natural parents to consent to such an adoption." *In re David,* 427 A.2d 795, 799 (R.I. 1981); see also Gordon, "Terminal Placements of Children and Permanent Termination of Parental Rights: The New York Permanent Neglect Statute," 46 St. John's L. Rev. 215, 229 (1971). The prospects for adoption are, therefore, dimmer where "termination" is not truly final.

The majority goes on to point out that "[a] finding that a statutory ground for termination has been established does not automatically require the termination of parental rights, because the statute is phrased permissively: 'The superior court . . . *may* grant such petition upon finding [one of the five grounds for termination] . . . .' " (Emphasis in majority opinion.) Again, termination was what

---

[4] This signal is amplified by the statement that consideration on remand "would include any substantial change in circumstances which has occurred during the pendency of the appeal indicating that the ground for termination which we rely upon no longer exists."

the petitioner sought and what the respondent opposed. The trial court was *empowered* by this very statute to terminate parental rights and it did so by a final judgment. This appeal followed. I do not at all understand how the majority can find error and remand as it does when it finds that the trial court rendered a judgment finding proven a specific statutory ground permitting it to terminate parental rights. That was *the* judgment; the majority expressly says that this appeal is from a judgment "terminating her [Mrs. S'] parental rights." That judgment as rendered comes before this court. It is not divisible; here it must be either affirmed or reversed.

Therefore, I respectfully dissent.