MEMORANDUM OF DECISION
This case presents a co-terminous petition[2] for the termination of the parental rights of Aida M. and Eric C. who are the biological parents of the minor child Aida M. and, simultaneously, an action for neglect with respect to the minor child Carmela O. whose parents are Aida M. and Bonifacio O.C.[3] The minor child Aida M. is presently sixteen years of age and wishes to be adopted. The minor child Carmela is thirteen years of age and wishes to remain with her present foster family. A termination of parental rights has been brought with respect to Aida M. only and not with respect to Carmela.
The court finds that the mother has appeared and has a court appointed attorney, as well as a court-appointed guardian ad litem. The court finds that both fathers have been served by constructive notice and have failed to appear. These cases have been pending in the court system since November 21, 1989 and neither father has supported the children, has had any physical involvement or has demonstrated any interest in the children in the past seven years. The court further finds that it is unnecessary to appoint an attorney for those male biological parents. The court has jurisdiction in this matter; there is no pending action affecting custody of the children in any other court and reasonable efforts have been made to locate the missing parents.
The court having read the verified petitions, the social studies, the various documents entered into evidence and heard the testimony of various case workers and evaluators, makes the following findings by clear and convincing evidence.
On November 21, 1989 the Department of Children and Youth Services, now known as the Department of Children and Families CT Page 3304 (DCF), applied for and obtained an order of temporary custody regarding the two children who were at that time nine years of age and five years of age. The summary of facts to substantiate the allegations of neglect filed with the court on November 21, 1989 narrates the following history. On or about September 18, 1989, DCF was contacted by a physician at the Hartford Hospital Pediatric Clinic. The report to DCF basically indicated that the mother of Carmela, Aida M., told the hospital authorities on August [sic] 15, 1989, that Carmela, who was then five years of age, came home from school and told the mother that two men at school had each placed their penises in her anus. The mother said she was sick with asthma over the weekend and was unable to take Carmela in to the hospital until the following Monday. Aida, the mother, reported to the hospital authorities that Carmela had complained of pain in her vaginal area and that there was a yellowish discharge from Carmela's vagina.
Carmela was seen in the clinic on September 18, 1989. The physical examination was normal except for a tiny scratch in the area of her vagina. There was no bleeding, trauma, bruising or discharge. The anal area was completely normal. The story told by the mother and by Carmela varied greatly in detail with each recounting of the story.
The case worker who went to the mother's apartment with anatomically correct dolls and drawings found the apartment to be a very small two bedroom apartment with one twin bed in each room. There was clothing all over the rooms, the beds were without sheets and the smell of urine was very bad. There was also a dog in the apartment which made the odors even worse. When Carmela was interviewed she giggled throughout the interview. Carmela was unable to elaborate except to say that Jesus and Jerry had been doing "fresh things to her". The DCF worker noticed that during the entire interview Aida, the mother, was in the next room laughing whenever the child was unable to state what happened to her.
The child Carmela and her mother were evaluated at Hartford Hospital over the course of seven days. The team of physicians concluded that they could not state that Carmela showed psychological evidence of sexual abuse and that there was no medical evidence of sexual abuse. The doctors stated that the case has suggestions of Munchausen Syndrome By Proxy.
After an exhaustive police investigation the detective CT Page 3305 concluded that there was no evidence of sexual abuse. The officer found that while at school the children were not allowed to go to the bathroom by themselves; the teacher accompanied the youngsters to the bathroom; the two men that the child accused of doing this were maintenance people who worked on the second floor of the building; the child's classes were all on the first floor of the building; the stories told by parent and child were lacking in detail and inconclusive; and there was no medical evidence to support the allegation.
The Department had received two prior referrals regarding this family. One in October, 1984 when the child Aida disclosed to her mother that while her mother was in the hospital having Carmela (March 26, 1984), her thirteen year old cousin had come into her room with a knife and put his "things in her back, hit her in the face and told her if she told her mother he would kill her". The mother did not follow through with this by contacting the police. On September 15, 1986 the department received another referral regarding the child Carmela. The mother had brought the child to the hospital saying that the child was complaining of itching around the rectum and pain after urinating. According to the mother the bus driver stuck his tongue out and put it in Carmela's vaginal area. The police did an investigation; the story was very inconsistent; sexual abuse was not substantiated by a medical evaluation; the police closed their case. Attempts by the DCF worker to engage mother in counselling were futile. Specifically, on September 9, 1989 the case worker discussed at length with the mother the importance of a psychological evaluation.
Subsequently in October, 1989 and November, 1989 more complaints were made by the mother that her child Carmela had been sexually assaulted. On each occasion the child would be interviewed and was usually laughing in describing the incident. It should be noted that each time the mother took the children to the hospital they were subjected to interviews and invasive medical procedures to determine if there were any physical signs of sexual abuse.
Munchausen Syndrome By Proxy may be defined as "the cluster of symptoms and or signs, circumstantially related, in which (1) illness in a child is simulated (faked) and/or produced by parent or someone who is in loco parentis; and (2) the child presents for medical assessment and care, usually persistently, often resulting in multiple medical procedures; and (3) knowledge about CT Page 3306 the etiology of the child's illness is denied by the perpetrator; and (4) acute symptoms and signs in the child abate when the child is separated from the perpetrator.[4]
On November 21, 1989, DCF sought and obtained an order of temporary custody at the Superior Court for Juvenile Matters in Hartford. On November 30, 1989 the order was confirmed with respect to Carmela and the child, Aida, was permitted to return to her mother's care. Carmela, Aida and the mother were referred to Dr. Julia Ramos-Grenier, a psychologist, for evaluation. The mother brought the children for evaluation but resisted an evaluation herself. She and her brother, who had brought her to the evaluation, would not participate in a court ordered evaluation. Since the psychologist was unable to evaluate the mother the psychologist concluded as follows:
 The results of this evaluation indicate that both Carmela and Aida have been exposed to sexual activity and/or information. Given the changing stories by Carmela it is impossible to determine what type of sexual abuse had occurred with these children and by whom. More important is mother's own participation in exposing the children to sexual information through suggestions and facts she appears to have shared with those children. A factitious disorder (formally Munchausen Syndrome) cannot be diagnosed given that Ms. M. could not be seen by this evaluator. It is this evaluator's opinion however that mother has participated in developing and structuring the children's allegation of sexual abuse by others. Although this is not eminently, physically dangerous to the children it does pose serious risks for emotional problems which is apparent in that both children have indications of anxiety and stress as shown by this evaluation. (Child's Ex. 2.)
Dr. Ramos-Grenier recommended that both of the children be placed in foster placement due to the poor relationship they had with their biological mother and a lack of structure in the mother's home. In 1990 both children were adjudicated neglected and committed to DCF.
Prior to the children being placed in late 1989, the mother was advised by Dr. Szajnberg of Hartford Hospital to seek further evaluation and possible psychiatric treatment. Another doctor at Hartford Hospital, Dr. Dworkind reported that mother, "exhibited bizarre behavior, staring off into space, and sitting . . . in a CT Page 3307 chair with a sheet over her head". Dr. Dworkin indicated that mother was unable to care for her children and that they would be in great danger if allowed to return to their home environment.
These children were committed in 1990 and have remained in foster care for the past seven years. At the time of the children's commitment and at each subsequent extension of commitment, the court ordered mother to participate in a psychological evaluation and to seek psychiatric treatment, if necessary. The mother has not attended any of the court ordered evaluations and has maintained all along that she neither needs treatment nor will participate in any psychiatric or psychological evaluation and treatment.
After the case was referred from the Hartford court to the Child Protection Session in Middletown the court ordered a competency evaluation of Aida M. With the assistance of her court-appointed attorney, her guardian ad litem and her 29 year old adult son, the mother was evaluated by Dr. Sergio Mejia, a psychiatrist, on January 8, 1997. The doctor rendered a report and appeared in court to testify. The interview was conducted in mother's native tongue, Spanish. Dr. Mejia indicated:
 The patient is very negative about the system's ability to deliver justice. She is frustrated and disenchanted with her lawyer. She was not able to tell me whether or not she has one or even the names of anybody who has spoken on her behalf in the past. She insists that the system will not "do any good" and she is determined not to cooperate. For instance, she boasts of the fact that she no longer keeps appointments. She said that she is not going to the appointment on the sixteenth of January "because they are not going to give me my children. Why would I go there, to waste my time?"[5]
(Court's Ex. 2.)
Dr. Mejia also noted that mother had been told on several occasions that she needs to see a psychiatrist but she refuses to do so and offers no explanation as to why she continues to refuse. He further indicated that she has been told that psychiatric treatment would help her but that ". . . she is determined she is not going to seek any medical help. " He concluded his examination by finding that Aida M. is not mentally competent to understand the procedures to assist her attorney.
The court notes that the incompetent/respondent/mother did CT Page 3308 not appear for any of the hearings for the termination of parental rights, even though it was quite clear to her from the competency evaluation that she knew the trial was to commence on January 16, 1997, eight days after her meeting with the doctor. Dr. Mejia's s report indicates quite clearly that it was not the intention of the mother to cooperate in any way in these proceedings.
The attorney for mother asked Yolanda Bonnick McGhee, the DCF case worker, whether the case worker had any discussions with the mother while transporting her to and from visitations. The case worker indicated that they often talked about the need for Aida to receive psychological evaluation and treatment. The case worker indicated "[S]he refused to attend anything that I offered to her." The case worker explained to the mother that getting treatment was important to the mother's stated objective, this is, having her children returned to her care. Aida M., however, refused to attend any of the appointments that were set up for evaluation and treatment. The attorney for mother asked the case worker, "[W]hat is DCF's mission in this regard?" to which the case worker replied, "I think it is twofold: first, protecting children and secondly, empowering families, getting families to operate independently of the system".
This court has carefully considered the findings regarding competency hearings as set forth in In re Alexander V.,223 Conn. 557, 564 (1993), 613 A.2d 780 (1992). The court has attempted to balance the interests of the mother in maintaining the integrity of her family free of coercive state interference with the interests of the children in this case. The court has appointed a guardian ad litem for mother who attended each day of trial. The court has also appointed an attorney for mother who effectively represented the mother in her absence. The court has ordered a competency evaluation and has found the mother to be not legally competent.
Mother's declared intention is to avoid cooperation with DCF and not to attend the court proceedings. The court finds that DCF has consistently and regularly indicated to mother the urgency of her having a psychological and/or psychiatric evaluation as well as of her need to obtain treatment before the children could possibly be returned to her. These overtures towards the mother began in 1989 and continued through 1996. The children have been in foster care for seven years. Our Supreme Court has long recognized the deliterious effect of prolonged temporary care of CT Page 3309 abused and neglected children. In re Juvenile Appeal (84-CD),189 Conn. 276 (1983). The Appellate Court has also correctly noted, "[b]ecause of the psychological effects of prolonged termination proceedings on young children, time is of the essence . . ." In reAlexander V., 25 Conn. App. 741, 748, 596 A.2d 930 (1992); see generally, JOSEPH GOLDSTEIN, ET AL., BEYOND THE BEST OF THE CHILD 99 (1979).
The court also considers specifically the issues of proceeding with an action for termination of parental rights given the mother's lack of legal competence and the possibility of a mental illness such as the suspected, but not confirmed, Munchausen Syndrome By Proxy.
The issues presented by a parent with a physical or mental impairment which renders the parent unable to provide a child with necessary care have been frequently addressed by courts faced with abuse, neglect, and termination cases. It is well established that mental illness does not prevent the court from proceeding in termination cases. The cases generally follow the rule that "[T]he legislature may properly strike the balance at the point where mental or physical deficiency, even though not involving fault, is as great as to render the parent incapable of measuring up to the child's needs as those are delineated in § 17-43a(a)(3)" (now known as General Statutes § 17a-112
(c)(3)(A)). In re Juvenile Appeal (83-BC), 189 Conn. 66, 78-79,454 A.2d 1262 (1983), also cited in In re Nicolina,9 Conn. App. 598, 605, 520 A.2d 639 cert. denied, 203 Conn. 804,525 A.2d 519 (1989). Similarly, in the case of In re David E.,4 Conn. App. 653, 655 (1985), the Appellate Court affirmed the trial court's finding that a termination of parental rights was appropriately granted where the respondent's continuing mental deficiency rendered her unable to provide the child with the necessary care, guidance and control necessary to his physical, educational, moral, and emotional well-being. A person may be mentally ill and yet not incompetent. In re Lori Beth D., 21 Conn. App. 226,231 (1990). Accordingly, there is precedent for proceeding against a competent, but mentally ill parent.
The issue of proceeding in a case where there is a finding of incompetence of a respondent-parent does not appear to have been directly addressed by any Connecticut appellate court, although, in footnote 7, the Alexander V. court noted in part:
Certainly it could not be expected that termination CT Page 3310 proceedings be stayed indefinitely, or for any great length of time in order to restore a parent to competency, as that would create too great a risk to the welfare of the child and might well create the anomalous situation where the very incompetency that makes termination imperative, prevents it. In re Alexander V., 223 Conn. at 565.
General Statutes § 45a-708 (a) requires the court in an action to terminate parental rights to appoint a guardian ad litem for any parent who is either a minor child or an incompetent. The statute provides no guidance with respect to a hearing or to the method of proceeding against the incompetent parent as there is in criminal cases. General Statutes §54-56d prescribes very detailed instructions to a criminal court on proceeding against a person found competent and against a person found incompetent.
Using § 54-56d for general guidance, the court ordered a competency evaluation in a timely fashion. In this case the evaluation was conducted eight days prior to the start of the trial. The evaluation was to be conducted by a physician specializing in psychiatry or a clinical psychologist. The evaluator here was a psychiatrist from the Institute of Living in Hartford. The evaluator was required to examine the respondent and file a report indicating whether the respondent was competent to understand the nature of the proceedings or assist in her own defense. In this case we have a finding that the respondent is not competent "to understand the proceedings or to assist her attorney."
The Supreme Court in Alexander V. suggests that the duties of the trial court do not end with the determination of incompetency and the appointment of a guardian ad litem. The problem then confronted is posed as follows:
 By definition, a mentally incompetent person is one who is unable to understand the nature of the termination proceeding and unable to assist in the presentation of his or her case. See General Statutes 54-56d (a); Dusky v. United States, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960). Simply appointing a guardian ad litem for a parent in such a condition might well fail to protect the parent sufficiently against an unreliable adjudication terminating parental rights. A parent unable to understand the proceedings and unable to assist his or her attorney would likely be similarly CT Page 3311 unable to assist a guardian ad litem, and could be at a severe disadvantage in a termination proceeding because of his or her incapacity. Without the assistance of a competent parent, a guardian ad litem might be without sufficient information to rebut evidence offered by the state, which, although superficially damaging, could be refuted by a competent parent or a witness whose availability would be made known by a competent parent. Similarly, the ability of the guardian ad litem and mentally incompetent parent to offer affirmative proof of the existence or prospect of an ongoing parent-child relationship might be significantly compromised. In addition, the mentally incompetent parent might be unable to assist his or her attorney or guardian in establishing tactical and substantive goals at the termination proceeding. In sum, there is a cognizable risk that a parent unable to assist his or her attorney or to understand the proceedings might suffer an erroneous termination of parental rights regardless of whether a guardian ad litem had been appointed pursuant to 45a-708 (a). In re Alexander V., 223 Conn. at 563.
The Supreme Court then analyzed the reduction of risk which would occur if a guardian ad litem is appointed and a competency hearing is conducted. The court opined that additional expert testimony might be available and additional evidence might be gleaned to aid the trial court in making a decision:
 Thus enlightened, the trial court would be in a far better position to determine the most appropriate and beneficial course of action. In some cases, the appointment of a guardian ad litem might well constitute the best available procedure and be in accord with due process. In others, the court might conclude that a guardian ad litem alone would not be sufficient to comport with due process because of the probability that a parent could be restored to competency within a relatively short period of time. Under the latter set of circumstances, the trial court might conclude that other measures, including, possibly, a short stay of the termination proceedings, should be taken to protect the parent's fundamental right to care for his or her child. We need not decide today what specific measures the due process clause requires a trial court to take when it has determined that a parent is not legally competent. For present purposes, it is enough to recognize that a competency hearing would provide the trial court with a clearer understanding of the CT Page 3312 parent's capabilities and of the best available avenues along which to proceed. Accordingly, the availability of a competency hearing in a termination proceeding would significantly improve upon the present statutory procedure, which provides only for the appointment of a guardian ad litem, and would reduce the risk that a parent's rights might be erroneously terminated. Id. at 564.
This language raises issues for the attorney charged with representing and advocating for the mentally ill, incompetent, non-appearing respondent, for the guardian ad litem obligated to represent the interests of the ward, and for the trial court obligated to insure due process for all.
The procedural safeguards set forth in Mathews v. Eldridge,424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) and other considerations raised but not answered in Alexander V. provide some guidance for counsel and for the court. See also, Santoskyv. Kramer, 455 U.S. 751, 754, 102 S.Ct. 1388, 71 L.Ed.2d 599
(1982). This court concludes that in order to satisfy due process and to follow "the most appropriate and beneficial course of action"given a respondent who is not legally competent, this court, in addition to the appointment of a guardian and the conduct of a competency evaluation, must satisfy itself that the following considerations are addressed:
A. Is it likely that the evidence presented could be refuted by a competent parent? In the present case, the evidence is clear and convincingly in support of a termination of parental rights. The mother presents with certain mental illness and suspected Munchausen Syndrome By Proxy. The illness has persisted over seven years. The mother has never been able to present a plan for the care of her children. She has frequently indicated to all DCF caseworkers and Dr. Mejia that she will not go for either evaluation or for medical treatment. If the mother were subsequently found to be competent it would not eliminate her underlying mental illness or her unwillingness to obtain necessary treatment. The restoration of competence of the mother would not alter the well established history of dysfunction and non-parenting, nor would it necessarily lead to her rehabilitation within the meaning of General Statutes §17a-112 (c).
B. Could the parent be restored to competency within a reasonable time considering the ages and needs of the children? CT Page 3313 Here we have a psychiatric opinion rendered in May, 1990 (Child's Ex. 1) which reflects ". . .the probable presence of a psychotic illness." and an opinion that Aida M. was unable to provide a stable and safe environment for her two daughters as of that date. We have an evaluation of the children by Dr. Ramos-Grenier (Child's Ex. #2) in April, 1996 that finds, "[A]lthough I did not evaluate her, (mother's) behavior leads me to believe that it is unlikely that she will achieve a level of rehabilitation in a reasonable period of time so that she can resume a responsible position in Aida's life." We have a 1997 opinion from a second psychiatrist, Dr. Mejia, a senior consultant at the Institute of Living. In the report in which he finds the mother not legally competent, Dr Mejia notes recurrent themes existing over the past seven years which the respondent mother is absolutely and resolutely unwilling to address (Court's Ex. 1.) The court finds that it is not likely that the respondent could be restored to competency within a reasonable time considering the ages and needs of the children.
C. If the respondent were competent, is there likely to be proof of the existence of, or prospect of, an on-going parent-child relationship? In this case the respondent has not been in the role of custodial parent for more than seven years. The oldest child is sixteen and wishes to be adopted by her foster family with whom she does have a parent-child relationship. The younger child has a parent-child relationship with her foster family but does not wish to be adopted. Even if the respondent were competent, it is highly unlikely that any evidence of a parent-child relationship could ever be uncovered or established during the children's minority or within a reasonable time.
D. Was the respondent effectively represented by counsel and the guardian ad litem given the difficulties attendant in such representation? Here the attorney for Aida and the guardian were equally handicapped since Aida would not come to court nor meet with either attorney. Notwithstanding her refusal to cooperate on any level, both counsel resisted the termination, advocated for their client/ward, challenged the sufficiency of evidence proffered by the petitioner and cross examined the witnesses.
The role of an attorney for a child, or of a guardian ad litem for a minor child or a legally incompetent person has not been well defined in the various cases that have addressed those issues. See Knock vs Knock, 224 Conn. 776 (1993) (noting that CT Page 3314 representing the interests of children creates practical problems for an attorney and difficulties in delineating the obligations and limitations of the role of counsel); Taff v. Bettcher,35 Conn. App. 421 (1994) ("representation is the child's entitlement, not the parent's", without addressing the issue of the child's attorney not being present in a modification of custody hearing); Newman v. Newman, 35 Conn. App. 449 (1994) (holding that court-appointed counsel cannot prosecute an appeal on behalf of children but recognizing the right of a guardian ad litem to do that). See also a more definitive statement of the issues presented to attorneys in ROBERT A. SOLOMON, STAYING IN ROLE: REPRESENTING CHILDREN IN DEPENDENCY CASES, 70 Conn. B.J. 258 (August, 1996).
The Newman case not only does not clarify the roles of attorneys and guardians, but may inadvertently mislead counsel by noting "that the legal disability of an incompetent is analogous to that of a minor". Newman v. Newman, 35 Conn. App. at 454
citing with approval Cottrell v. Conn. Bank and Trust Co.,175 Conn. 257, 264, 398 A.2d 834 (1978). While the guardian for the child and the guardian for the adult may perform similar roles in that they are representing persons who lack legal competence, the roles may lead in absolutely opposite directions. The guardian of a child in a termination of rights case may wish to move the proceedings along to conclusion as expeditiously as possible to secure permanency for the child, whereas the guardian for the incompetent respondent may wish to delay the case as long as possible in order to allow time for the ward to regain competence.
Similarly, the role of attorney for the incompetent respondent and the guardian for the respondent may be completely at odds. In the present case the attorney for the mother and the guardian for the mother both elected to resist termination of the client/ward's parental rights. In another case the attorney for the respondent might resist termination, acting at the direction and in accordance with the client's wishes, whereas the guardian of the respondent may well take the position, after hearing expert opinion regarding the parent's psychiatric or medical condition, that it would not be in the best interests of the ward to be burdened with the responsibilities of caring for a child who, for example, has profound handicaps or special needs. The guardian would be in the position of the competent parent who recognizes that she is unable to parent the child with special needs or that the child is better off in a pre-adoptive foster CT Page 3315 home were the child is bonded and happy, and, accordingly, not contest the termination. In that rare case, unlike the attorney bound to advocate the declared wishes of her client, the guardian ad litem must exercise his or her independent judgment as to the best interests of the ward. The very appointment of the guardian admits the potential conflict between the respondent's declared wishes and their, undeclared, best interests. If the roles of the guardian and the attorney were the same, the appointment of a guardian would be unnecessary.
In the instant case, the non-appearance and lack of cooperation of the respondent only complicated the matter. Both the guardian and the attorney for the respondent acted appropriately to challenge the validity of the petitioner's case and to insure that the respondent did not lose by default. Under the circumstances they acted effectively to protect the respondent and to validate the actions of the court. The court finds that the representation of the attorney and the guardian ad litem was competent and effective.
This court concludes that the rights of the mother have been adequately protected and that due process rights of the respondent mother have been fully observed. The court further finds that delay would serve no useful purpose and that the best interest of the children require the court to proceed with this hearing.
ADJUDICATION
The court finds by clear and convincing evidence that Aida M. was born in November of 1947 in Puerto Rico where she attained a fourth grade education. She has had three pregnancies by three different men. The court further finds that DCF has made diligent efforts to locate the parents and to reunify the children with the mother. The court finds the mother unwilling to benefit from reunification efforts and that further offers of services would be unavailing.
Co-terminus Petition: Aida M.
By a fair preponderance of the evidence as of the date of the petition the court finds that the minor child Aida M. has been neglected in that she has been denied proper care and attention physically, educationally or morally. The court further finds that the child was uncared for in that the child's home could not CT Page 3316 provide the specialized care which the physical, emotional or mental condition of the child required in that the mother herself has psychiatric needs which she has failed to treat.
With respect to the statutory grounds for termination of parental rights the court finds by clear and convincing evidence existing at the date of trial, that this petition was brought on October 2, 1995 by the attorney for the minor child, Aida M. The petitioner is the Legal Aid Society of Hartford acting for the minor child, Aida.[6]
With respect to Eric C. the father of the minor child, Aida, that he has failed to support his child or take any interest in her whatsoever and has abandoned her as that term is defined in General Statutes § 17a-112c (3)(A).
The court finds by clear and convincing evidence that this child was previously found to be have been neglected on July 16, 1990. The court further finds the mother has failed to achieve such a degree of personal rehabilitation as would encourage the belief that within a reasonable time considering the age and needs of the child that she could assume a responsible position in the life of this child.
The court further finds by clear and convincing evidence that with respect to the mother and the father there is no on-going parent child relationship which is defined as the relationship that ordinarily develops as a result of a parent having met on a continuing day to day basis the physical, emotional, moral or educational needs of the child and to allow further time for the establishment or re-establishment of the parent child relationship would be detrimental to best interest of this sixteen year old child. The court finds that these grounds have existed for more than one year.
With respect to the mandatory factual findings required by General Statutes § 17a-112 (e):
1) The timeliness, nature and extend of services offered. The court finds that psychological and psychiatric services were offered, visitation was offered and foster care was provided by DCF. The court finds that the mother was unwilling to participate in needed psychiatric/psychological evaluation and treatment.
2) Whether DCF has made reasonable efforts to reunite the CT Page 3317 family pursuant to the adoption assistant and child welfare act of 1980. The court concludes that the Department waited an inordinate length of time to pursue termination of parental rights in this case for Aida and permanency planning for Carmela. The Department consistently offered services to the mother to aid in resolving her mental health issues but she was not willing to be assisted in this regard. The fathers of these children were not offered services because they could not be located and have never had an active role in the children's lives.
3) The terms of applicable orders entered into and agreed to by any individual or agency and the extend of fulfillment of those obligations, etc. The court finds that the mother did not fulfill or comply with any of the expectations which required her to seek help and treatment for her mental health issues.
4) The feelings and emotional ties of the child with respect to the parents and foster parents, etc. The court finds that Aida has no current on-going relationship with her mother and by the child's design is not visiting with her mother. This sixteen year old clearly expresses a desire to be adopted by her foster parents. She has bonded with the family and should be given the opportunity to be considered a legal member of that family.
5) As to the age of the child. The court has indicated earlier that since Aida is sixteen years old and of sufficient age and capacity to express an intelligent preference in this matter, the court will honor her wishes.
6) The efforts the parent has made to adjust her circumstances or conditions. The court finds that the mother has not made any meaningful attempt to adjust her circumstances, conduct or condition to facilitate reunification. While the mother has maintained incidental visitation through the years she has done nothing to rehabilitate herself as a parent. The only meaningful way that the mother could resume custody of her children was to address her mental health issues which she proudly will not do. According to Dr. Mejia (Court's Ex. 1 at 3), Aida M. "boasts of the fact that she no longer keeps appointments".
7) The court finds that there has been nothing to prevent the mother from maintaining a meaningful relationship with her children. There was no unreasonable conduct noted by DCF who offered services and provided transportation for visitation for CT Page 3318 many years in this case.
Based upon the foregoing findings, the court determines that it is in the child Aida's best interest for a termination of parental rights to enter with respect to the mother Aida M. and the biological parent Eric C. and accordingly a termination of parental rights is ordered. It is further ordered that the Commissioner of DCF is appointed statutory parent for the purpose of securing and adoptive family, to wit the pre-adoptive foster family. The commissioner shall file with this court no later than 90 days following the date of judgment a written report of efforts to effect such permanent placement and file further reports as are required by State and federal law.
Neglect Petition: Carmela O.
With respect to the minor child Carmela O., by a fair preponderance of the evidence as of the date of the petition, June 11, 1996, the court finds that Carmelo O. has been neglected in that the child had been denied proper care and attention physically, educationally and morally. The court further finds that the child has been neglected by the father in that the child has been abandoned. The father has never provided any support for the minor child, has never come forward with a plan to prevent out of home placement for the minor and has refused to take an interest in these proceedings.
With respect to the mother, the court also finds that the child has been uncared for in that the mother cannot provide the specialized care which the physical, emotional and mental condition of the child requires in that the mother herself has psychiatric needs which she has failed to treat.
The court directs DCF to prepare expectations for the mother which require her to attend a psychiatric evaluation and to follow the treatment recommendations as set forth in the evaluation and to set forth such other expectations as the Department believes necessary and appropriate under the circumstances. The minor child, Carmelo O., is hereby committed to the Commissioner of the Department of Children and Families for the statutory period of one year.
Francis J. Foley, Presiding Judge Child Protection Session CT Page 3319