[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
When Juan A. R., born September 12, 1989, was two months old, he became the subject of coterminously filed petitions in which the Department of Children and Youth Services (DCYS) alleged him to be a neglected child, having been abandoned, denied proper care and attention, and permitted to live under conditions injurious to his well being, as well as homeless under the definition of uncared-for in Sec. 46b-120 of the Conn. Gen. Stats. (Rev. 1989). At the same time, DCYS sought termination of the parental rights of Ana R. and Juan R.S., his mother and putative father on all three of the nonconsensual grounds found in Sec. 45-61f subsection (h) applicable to children not previously committed to DCYS as neglected or uncared-for.
An Order of Temporary Custody (O.T.C.), granted ex parte on the date of filing (November 17, 1989), was continued without prejudice at the 10 day hearing required by subsection (b) of Sec. 46b-129, the mother having been served but appearing without counsel on that date. No motion for an evidentiary hearing on the necessity for continuing the O.T.C. was subsequently made during the pendency of these proceedings.
In the plea hearing held December 12, 1989, the mother appeared with counsel and denied all allegations of both petitions. The putative father, whose whereabouts have at all times been unknown to the parties, was duly served by publication and appeared at none of the scheduled hearings. No attorney was appointed to represent the absent father. In Re. Bobby Jo S., 10 Conn. App. 36, 1987. On the oral motion of the petitioner, a psychological evaluation of mother and child was ordered to be conducted by a Spanish speaking clinical psychologist. Ana R. kept the subsequently scheduled appointment with Dr. Suarez, and lacking agreement at a pre-trial conference subsequent to submission of his report, a fully contested hearing was scheduled. After the petitioner rested on March 22, 1990, the mother's motion to dismiss abandonment as one of the grounds to terminate her parental rights was granted. On May 10, 1990 all parties rested and were given until June 21, 1990 for the submission of trial CT Page 1799 memoranda and responses thereto.
Since no amendments to either petition was filed, the adjudicatory date on both petitions is the date of filing: November 17, 1989. All evidence pertaining to the case subsequent to that date is therefore regarded as dispositional, the dispositional date being the last day of trial: May 10, 1990. The period of reserved decision commences on the date all trial memoranda were received: June 21, 1990.
Procedure to be followed
Where neglect and termination petitions are coterminously filed under subsection (e) of Sec. 17-43a, the court is required, first, to address the allegations of the neglect petition and determine, by a fair preponderance of evidence (P.B. Sec. 1043) if the child has been neglected or abused as of the date the petition was filed or last amended (here, 11/17/89) under the statutory definitions found in Sec. 46b-120 and Sec. 17-38a, subsection (b) which defines the term "abuse". If the petitioner's evidence does not support such a finding, then both petitions must be dismissed. Second, if the court finds the child to have been neglected or abused, disposition will be deferred until a decision is rendered on the termination petition since the granting of the relief there sought — the appointment of a statutory parent — transfers not just the custody and guardianship conferred upon DCYS by a commitment under subsection (d) of Sec. 46b-129, but also all residual parental rights including the right to place the child in adoption. Sec. 45-61h. If the evidence offered by the petitioner does not support, by a clear and convincing standard of proof (Sec. 45-61f(f); P.B. Sec. 1049) grounds for terminating parental rights under Sec. 45-61f, subsection (f) incorporated by reference in Sec. 17-43a(e), the court must return to the neglect petition and dispose of it, on facts as of the final trial date, (here, 5/10/90), either by committing the child to DCYS under subsection (d) of Sec.46b-129, leaving the child with the parent under court-ordered protective supervision (subsection (i) of Sec. 17-32d), or dismissing the case from further court accountability. Third, if grounds for termination of the parent's rights are found, the court must consider, as of the final trial date, whether such termination is in the best interests of the child after considering the six factors
Facts
Evidence offered at trial, interpreted in the light of CT Page 1800 the record concerning the mother's care of other children subject to petitions of neglect filed in this court, of which judicial notice is taken, supports the finding of the following facts:
At the time of Juan A. R.'s birth, his unmarried 34-year old mother had given birth to six other children, only one of whom remained in her care, a daughter then fourteen. A seventeen year old son, raised by Ana's mother, was serving a sentence for murder. A seven year old daughter was living with her father out of state. Sons born to Ana in 1983 and 1985 were living with her mother who had been granted their legal custody by the Probate Court. Another son, born prematurely on February 10, 1988, had remained in the hospital for four months after birth. Two days after this child (Frankie R.) had been placed with Ana, she gave permission for him to be placed in foster care after her arrest. Upon her release two months later, Frankie was returned to her care. Less then three months after that, Frankie was back in foster care as a result of an O.T.C. granted when the police found him home alone with his five year old brother, their mother's whereabouts then unknown. On December 20, 1988 Ana R. admitted the child was homeless due to her inability to provide a home because of her alcohol problems and agreed to his commitment to DCYS pursuant to subsection (d) of Sec. 46b-129. With the advice of counsel, she agreed with the court's expectations in order for her to be reunified with her son, which included engagement in treatment for her acknowledged alcohol problem to start with a period of inpatient hospitalization.
In the first month after Frank's commitment, Ana visited him only twice, entered no treatment program, moved without informing DCYS of her whereabouts, and returned to prison. On her release in early March of 1989 she disclosed her pregnancy with Juan and began to work on the expectations of the court. By May she was visiting Frank every week and keeping counseling appointments at the Institute of the Hispanic Family, but two months later these efforts had subsided. She stopped visiting Frankie, seeing him only once in July. She stopped counselling sessions. She returned briefly to prison for fighting with her boyfriend, and on her release was living in a shelter. The alcohol treatment which began in the spring had stopped by late summer, and by her own admission, Ana had again begun drinking on a regular basis. Evelyn Martinez, her alcohol counsellor at the Institute, testified on March 12, 1990 that out of 52 scheduled weekly sessions Ana kept 13 — most of these prior to August. Even during the period of her maximum compliance with the program, Ms. Martinez testified that Ana was never committed to treatment for her alcohol problem and had made no progress CT Page 1801 with it. Ana's concerns centered around her financial and housing problems, and was always reluctant to talk about her alcohol problem despite admitting its existence.
Ana was still living in a shelter when Juan was born. The DCYS worker assigned to Frank's case had recommended that Ana enter Crossroads after the baby was born, the only bilingual program in the state where she could keep her baby while receiving substance abuse counselling. Ten days after Juan's premature birth on September 12, 1989, Ms. Martinez took Ana to see Crossroads in New Haven. Ana refused the program because it was "too far away" and would "take too long." Thereafter she kept only one more appointment on an outpatient basis with Ms. Martinez before the episode that resulted in loss of the baby's custody.
On November 10, 1989 Juan had been brought by Ana's 14 year old daughter to the home of a neighboring acquaintance, Nancy O., who had cared for Juan for several weeks earlier. The baby was accompanied by a diaper on which was written his birth date and other information concerning his birth (State's Exh. B.) along with a large number of official cards including Ana's identification cards for food stamps, Hartford Hospital, Hartford Department of Social Services, Medicaid (for herself and her daughter), her own social security and for various social agencies. (State's Exhibits C and E.) Nancy O. was also given a bag of baby clothes, milk and food. (Testimony of Nancy O., March 12, 1990.) Three days later Ana reappeared, apparently (to Nancy) under the influence of liquor, and had an argument with her boyfriend, during the course of which the child appeared to be at risk. Because Nancy O. believed Ana to be drunk, she refused to hand Juan back to her upon demand. Ana did not argue with this, but to avoid the child's being taken by the boyfriend, she agreed that Juan could be given to Nancy's father, who happened to be present during this altercation. In Ana's presence, Nancy's father then handed the baby to a Gloria D., a stranger to Ana, who also happened to be visiting at the same time. When Gloria, in Ana's presence, took baby, clothes, and all the identification cards home with her, she made no objection and asked no questions even though Gloria, a stranger, departed for a destination unknown to her.
The next day Gloria, seeking help with the baby called the San Juan Center which, in turn, contacted DCYS which promptly placed the child on a 96 hour administrative hold (Sec. 17-38A, subsection (e)) and instituted this action. The DCYS social worker attempted to locate Ana without success, inquiring at her last known shelter address and at the home of the maternal grandmother who reported not having seen Ana for the past three days. It was not until Wednesday, November 15, CT Page 1802 1989, that Ana contacted DCYS, claiming that she had not abandoned the baby but had merely left him for a couple of hours on the preceding Friday with someone named Nancy whose last name and address she did not know. (Testimony of Social Worker De Jesus, March 5, 1990.) A visit was subsequently arranged to take place in the DCYS office later in November. On the day of the visit, Ana telephoned to cancel a half-hour before the scheduled time, giving no reason — too late to prevent the social worker from picking the baby up on a cold and rainy day to be transported to the visit. Between that contact in November and the date of giving her testimony (March 5, 1990) Ana did not again call DCYS, either to request another visit or to inquire as to the baby's health.
Testifying on her own behalf, Ana's account of the events of November 1989 were in stark contrast to that of all of the other witnesses: She claimed that she had asked Nancy to baby sit for two hours only, and when she returned (in two hours) to pick him up, Nancy told her the baby was with her father. Ana did not explain why she had left the baby's clothes and all her medical and other identification cards with Nancy for a two hour baby sit. She claimed she was attending counselling notwithstanding Ms. Martinez's representation that the Institute had closed her case for non-compliance with scheduled appointments. When asked if the counselling she was attending was for her drinking, she responded (through a judicial department interpreter) "I think so." Asked why she had rejected Crossroads when she could have kept Juan with her there, she responded "I had a lot of problems" and claimed she had not known she could keep him with her, notwithstanding the testimony of two witnesses that she had been told of this fact: the DCYS social worker and Ms. Martinez. When asked if she planned to become involved in a program in Hartford, she replied "Only if I can have my kids back after the program." By the time of her testimony, Ana was once again back in Niantic, this time for failure to appear on March 23, 1990 and on new charges of assault and threatening on April 3, 1990 while she was drunk. Ana repeated several times that she had "a lot of problems" for which she had gone to counselling in the past, but had not found it helpful.
By her own admission, Ana continued to drink after Juan was born, but she claimed she had always taken him to her mother's before getting drunk. She did not explain why she had not asked her mother to watch him on November 10 instead of leaving him with Nancy O. While denying that she suffered from blackouts, she admitted that at times she could not remember what had happened when she was drinking. She denied using other drugs since she was a teenager. Two of her sisters testified on her behalf, neither of whom had been aware of her admitted 15 CT Page 1803 year history of alcohol abuse and both of whom felt she was a good and sober mother whenever they saw her with her children.
Her sisters' view of Ana sharply contrasted with that of the court-appointed clinical psychologist, Dr. Ramos-Grenier. (State's Exh. F.) Ana had arrived for the scheduled evaluation on January 17, 1990 clearly under the influence of alcohol. (Id., p. 2) On that occasion she described her alcohol problem as being severe. During the session, the psychologist observed ". . .continuous movements, restlessness and unusual inappropriate movements" with a "severe" level of psychological distress evidenced by "crying, tearfulness, anger, apprehension, speaking very loudly, swearing repeatedly, and making threats." (Id.) She admitted being severely depressed and suffering strong feelings of anxiety for the previous six months — two months before Juan's birth. Her thinking was incoherent, perseverative, confused, and with indications of delusional thinking involving thoughts of persecution. (Id., p. 3) "She admitted to obsessive thoughts concerning violence" which, when directed to the teenaged daughter who lived with her, took the form of stating "that she was going to `break her face.'" She reported to Dr. Ramos-Grenier current heavy use of alcohol on a daily basis against a past pattern of fifteen years of alcohol abuse along with occasional use of illicit drugs. (Id. p. 4.)
In her evaluation, Ana's anger was focused on the previous DCYS social worker, at one point stating "that if she has to kill her, she will." (Id. p. 4) From this, the psychologist inferred that "given her current drinking habits, this makes her a potential danger to others." Apart from verbalizations, Ana "did not show very much affection toward Juan other than to kiss him when his foster mother left." Bonding between Ana and Juan could not be assessed because Ana did not ask to hold the baby ". . . .and given the mother's level of intoxication the evaluator did not suggest she do so." (Id.) The psychologist concluded that Ana's substance abuse problem at present is interfering with her ability to effectively parent Juan, and found the prognosis for change, even with appropriate treatment to be poor because of Ana's lack of motivation. Reunification should be considered only if she were to follow through with treatment starting with inpatient followed by outpatient therapy combined with regular attendance at AA, and suggested re-evaluating the situation in six months.
In her testimony of March 12, 1990, Dr. Ramos-Grenier tempered her recommendation for a second look in six months after hearing of the mother's refusal to enter Crossroads or to follow though with outpatient treatment. While recovery from alcohol addiction is always "possible", this can only happen where there is motivation for treatment, and the longer the CT Page 1804 problem has existed, the more difficult it is to engage in treatment and the more damage can have been done to the brain and physical health. Because of Ana's long history of alcohol abuse and refusal of both inpatient and outpatient treatment, the psychologist concluded that she was "highly resistant" to treatment, resulting in the poor prognosis for change. This being so, she no longer recommended that Juan, already six months old at the time of her testimony, should have to wait another six months for any signs that his mother could rehabilitate in time to care for him. Further, in addition to substance abuse, Ana suffers from other serious psychological problems with some delusional and paranoid ideation. While there thus far had been no history of violence presented to her children, there was a recent history of physical assaults on boyfriends, blackouts, and verbal threats toward others including her own daughter. If Ana were to embark on the prescribed course of treatment at once, visiting the child at least twice weekly during the inpatient phase and more often while an outpatient, Juan might be able to afford to wait six more months for his mother's recovery.
By the time of the last hearing May 10, 1990, Ana had begun no treatment program, in or outpatient, but testified she was willing to do so because that is "the only way I can have my kids back."
Adjudication — on facts as of November 17, 1989
1. Neglect petition: The foregoing record establishes by a preponderence of the evidence that Juan A. R. is neglected, by both parents, by reason of having been abandoned. His father has never offered to care for him and at the time of filing, and for the six months subsequent thereto, his whereabouts have been unknown. His mother left him with a comparative stranger for a matter of days during which her whereabouts were unknown to the caretaker. For a child to be abandoned under the definition of neglect found in Sec. 46b-120, there must be a total relinquishment of responsibility for him, but no prescribed duration is required. Juan was therefore abandoned by his mother for five days in November of 1989. The child is also uncared-for in the sense of being homeless as to both parents: The putative father has never offered a plan for the child's care, and Ana's chronic homelessness, frequent incarcerations, and protracted periods when neither her mother nor her child's caretakers could locate her, renders him homeless as to her at the time these petitions were filed. Further, "home", at least for an infant, means more than "house"; it implies the presence of a competent caretaker. A mother who drinks on a daily basis and has a "severe" problem with alcohol is not such a caretaker. There is CT Page 1805 one further ground as to the mother: While the state offered no evidence that Juan, during the few weeks that his mother was his primary caretaker, suffered any demonstrable physical or emotional damage due to a parental "denial of proper care and attention" within the definition of neglect found in Sec. 46b-120, it is a reasonable inference that a person with a severe alcohol problem, a person who drinks on a daily basis as a continuation of a 15-year pattern, creates conditions likely to be injurious to the well-being of an infant. The fact that Ana, when sober, is a competent mother, that she apparently left him with caretakers (her mother; Nancy O.) who attended to his needs in her absence during his first two months of life, cannot compensate for her psychological as well as physical withdrawal from him during her alcoholic episodes. Leaving a two month old with a woman whose last name she did not know, whose address she could not give, while parting with documents essential for her own survival — relinquishing of her own social security, medical and food stamp cards — for what she purported was to have been a two-hour baby-sit is ample illustration of such "conditions." Two months after losing the temporary custody of Juan — as she had lost custody of five of her other six children previously Ana appeared too drunk in the psychologist's office to be entrusted with holding her own baby. A court need not wait for actual damage to have occurred (". . . is being denied proper care and attention, physically, educationally, emotionally or morally"); it may find a child neglected who "is being permitted to live under conditions, circumstances or associations injurious to the well-being." Since it is an accepted principle of statutory construction that a legislature does not intend a redundancy, it is fair to interpret these different definitions of neglect in Sec. 46b-120 as meaning different situations: One already demonstrated; one potential. By this interpretation Juan was neglected by his mother by reason of the "conditions, circumstances and associations" under which he lived by reason of her addiction to alcohol. 2. Termination petition: The court has already dismissed "abandonment" as ground for terminating Ana's parental rights in Juan. While the five-day abandonment was sufficient for an adjudication of neglect which requires no specified time lapse and only a preponderence of the evidence, to terminate on this ground a court must find that it existed for one year — or find clear and convincing evidence that the one year requirement should be waived — AND that it has been proven by a clear and convincing standard of proof. Neither burden was sustained by the state's case here: The court would have to waive 360 of the 365 days required by the statute which, under the circumstances of the mother's reappearance after five days and attendance at all court hearings, it cannot do. Further, while the mother did not make an effort to regain CT Page 1806 her child for the five days in November when she left him with Nancy O., she had provided him with clothes, food, and documents that appeared to have been intended to ensure that he obtained medical care and food. Under all of the circumstances, this was a "reasonable degree of interest, concern or responsibility as to the welfare of the child" within the meaning of abandonment as ground to terminate parental rights found in subsection (f) of Sec. 45-61f. Her failure to ask for visits for the four months following the granting of the O.T.C. might have constituted grounds for termination for abandonment, but the petitioner, having not amended its pleadings prior to commencement of trial, must be confined to circumstances existing on the date the petition was filed — November 17, 1989 — as the adjudicatory date.
The petitioner has similarly failed to sustain its burden of proving the second ground pleaded for terminating Ana's parental rights: While establishing Ana's acts of omission resulting from her continued, longstanding, and untreated alcohol addiction, no proof was offered that Juan — so far in his short life — had ever been denied any necessary care, guidance or control. No evidence was offered to contradict Ana's explanation that, prior to November, she had always left Juan in her mother's care when she went off on binges. In November, while inexplicably leaving Juan first with a comparative stranger and then standing by while the child and his effects went off with a total stranger, Ana had ensured that her baby would have clothes, food and medical care during her absence by leaving these objects with Nancy O. No evidence was offered that the child was not gaining weight appropriately, developing normally, or receiving medical care. A court may not infer from a child's having been left with babysitters on a number of occasions during infancy that he has not received adequate care during those occasions. While a court may infer that a mother, when under the influence of drugs or alcohol on a daily basis, is not capable of providing good "physical, educational, moral of emotional" care, such an inference cannot rise to the level of clear and convincing proof that the child already "has been denied" such care. This ground for terminating the parental rights of Ana R. is therefore dismissed.
The petitioner has, however, established by the necessary standard of proof, the third pleaded ground for terminating Ana's parental rights: There is unquestionably no parent-child relationship existing between Juan and his mother at the time of the evaluation conducted two months after the adjudicatory date. In November, at the time of being left with Nancy O., Juan was only eight weeks old, having been left with his grandmother or Nancy on a number of occasions. CT Page 1807 Ana had therefore provided direct care for only a few weeks of the infant's life. There can be little question that under these circumstances whatever relationship existed between Ana and Juan, it could not be described as
 . . . the relationship that ordinarily develops as a result of a parent having met on a continuing, day-to-day basis the physical, emotional, moral and educational needs of the child. . . .
within the meaning of Sec. 45-61f(f). That fact alone, however, is not grounds to terminate a parent's rights. The court must also find, by the same high standard of proof, that
 . . .to allow further time for the establishment or reestablishment of the parent child relationship would be detrimental to the best interests of the child.
The evidence is clear and convincing in this case that delay is highly unlikely to produce any change in Ana's pattern of the last 15 years during which she has lost custody of five of her other six children, and is angry enough with the sixth, who presently lives with her, to tell the psychologist she could "break her face". Dr. Ramos-Grenier, who had originally suggested taking a second look in six months to see if Ana could break this pattern by engaging in consistent alcohol treatment, changed her recommendation upon learning that just a year before, having admitted her alcohol problem prevented her from caring for Frankie and agreed to enter treatment, Ana had done nothing to address the problem. Instead, she accelerated her drinking during her pregnancy with Juan, returned to prison on a number of occasions, refused a residential program where she could have kept Juan with her, failed to ask for visits with him after his placement in foster care, and denied that counselling had ever helped or that she needed any counselling. With this information, the psychologist concluded the prognosis was poor for any change and recommended that Juan be required to wait no longer for the parent-child relationship to be established. The petitioner has thus, established this third, nonconsensual ground for terminating the parental rights of Ana R. in her son, Juan.
The total absence of the putative father from the life of this child and the fact that his whereabouts have at all times been unknown to all parties and this court permits CT Page 1808 the finding of two grounds for terminating his parental rights: A court may waive the 12-month requirement, even after an abandonment of only two months, under these circumstances since there is no scintilla of evidence that the passage of time will produce any more evidence of the existence of Juan R. S. as a factor in this child's life than has been evidenced in the past. Further, such total absence permits the inference that no relationship could exist between this child and his absent father, and to permit further time to pass in the hope that a relationship could be established without any evidence to support a reasonable belief that the future will hold anything different would clearly be detrimental to the best interests of this child whose need for nurture is vital to his well-being, and whose adoptability is greater now that it will be a year or two from now. The petitioner has thus established two of the non-consensual grounds for terminating the parental rights of Juan R. S. in his son, Juan A. R.
Disposition: on facts as of May 10, 1990
In the nearly six months between the adjudicatory date and the final day of hearing (e.g. the dispositional date) there was no change in the father's situation: He remains invisible to Juan, his whereabouts continuing to be unknown. Ana paid one more visit to the counsellor in December, and was then discontinued in January for failing to keep any more visits. Her motivation to resume treatment for her alcoholism is slight: On April 26, 1990 she testified she had rejected Crossroads, despite the fact that she could have kept custody of Juan had she gone there, preferring to find a program "here in Hartford" — presumably the program that discharged her for noncompliance. Asked if she now would get into a program she replied, "Only if I can have my kids back after the program." Recalled on May 10, 1990, she volunteered that she was now willing to enroll in an alcohol treatment program "because I need it", but then added that that was the only way she could have her kids back. It is clear that the only motivation for treatment is to satisfy the authorities that have removed her children, not to end a chronic problem of alcohol abuse.
Before a court may terminate a parent's rights it must consider the six factors set forth in subsection (h) of Sec. 45-61f:
(1) The only services that could be offered to facilitate Ana's reunion with this child was referral to alcohol counselling programs and the facilitation of visitation. Both were done, in connection not only with this child but also with his half-brother, Frankie, who was before CT Page 1809 the court eleven months before these petitions were filed on Juan. The similarity of circumstances surrounding the removal of both boys from their mother's care is remarkable: Left as infants with inappropriate caretakers while their mother was drinking, resulting in emergency placement in DCYS foster homes. The experience with Frankie, which the mother had admitted was due to her alcohol problem, has done nothing to change her pattern: She continues to have a severe, daily drinking problem for which she is not motivated to seek treatment, and she has visited infrequently.
(2) Although there were no court orders issued in connection with Frankie's commitment in December 1988, expectations were spelled out for Ana to fulfill: visiting and counselling. She has fulfilled neither.
(3) Juan has no emotional tie with a mother who has cared for him a matter of weeks and with whom he has not lived for six of his eight month life. No one has exercised care, custody or control of him for at least one year.
(4) Juan at six months of age needs secure, predictable, responsible parenting as much as he does food or medical care. In the absence of his mother's present ability to provide this and considering the poor prognosis for any improvement in her parenting abilities in the foreseeable future, there can only be a detriment to waiting longer for a permanent home. He is more adoptable now than he will be in another year or two. (Testimony of Ramos Grenier) Given the improbability of his mother's rehabilitation on this record considered as a whole, his well-being requires placement in a permanent home now, before he becomes too bonded with foster parents who may not be able to keep him. The only way to assure such permanence is through adoption.
(5) Neither parent has made any effort to adjust their circumstances, conduct or conditions to make in the best interest of this child to be returned to either of their homes in the foreseeable future. His father remains among the missing, as far as little Juan is concerned. His mother has been in and out of jail since his birth, most recently for assault, and continues drinking — even on the day of her long-scheduled psychological evaluation. She refused the one program that would have permitted her to address her alcohol problem without parting from Juan as an infant; she has not followed through on any alternative program; she has not visited, or requested visits, on a regular basis. CT Page 1810 (6) Nothing has prevented Ana from maintaining a meaningful relationship with the child. She could have entered Crossroads and kept the baby, but declined. She could have followed through with the counselling at the Institute, but she stopped going two months before Juan was born — coincident with her resumption of heavy drinking on a daily basis. She could have visited on a regular basis during the periods she was not incarcerated, but failed to ask for visits. She has distanced herself from this baby by being incarcerated on at least two occasions since her son was placed in foster care.
Having considered all of these factors, and with recognition of the fact that when sober, Ana R. can be a competent parent, but that her lack of sobriety has caused her to lose custody of two children in less than one year, it is found to be clearly and convincingly in the best interests of Juan A. R. for his parental rights to be terminated without further delay so that he may be placed in the security of adoption at a young enough age for him to maximize the chance for this to be a successful adoption. While the court can sympathize with the plight of an addicted mother who wants to do the right thing by her child but is unable to do so, it is the best interests of the child — not the parent — that must prevail. In re Juvenile Appeal, (83-DC),189 Conn. 66, 78-79 (1983). Ana continues to have parental rights in her other six children; if she can deal successfully with her alcoholism, reestablish a relationship with them by consistent visitation, stay out of prison and establish a home to which children can be taken first to visit, then to live, it is not too late for her to regain her position as primary caretaker in the life of any of these older children. But it is too late for her to do so with regard to this child.
It is therefore ORDERED that the parental rights of Ana R. and Juan R. S. in and to the child Juan A. R. be, and hereby are, terminated. And it is further ORDERED that the Commissioner of DCYS be appointed statutory parent for the purpose of placing the said child forthwith in adoption, and to this end the said Commissioner is ORDERED to submit to this court a written report as to the progress toward such adoption no later than 90 days from the date of this judgment, and thereafter at such intervals and in such form as the court may from time to time require. If adoption is not finalized on or before December 31, 1991, the Commissioner is further ORDERED to submit by that date a Motion to Review Plan for Terminated Child, as required by Federal law.
Appeal
Ana R. has 20 days from the date of this judgment in which to seek an appeal. If, after being informed by her trial CT Page 1811 counsel of the court's judgment and her right to take an appeal, she affirmatively manifests her desire to do so, if her trial counsel is willing to act in that capacity, the court will appoint him for this purpose. If the respondent manifests her desire to take an appeal and if her trial counsel declines to represent her because in his professional opinion it lacks merit, he is not required to do so but may file a timely motion to withdraw and to extend time in which to take an appeal. The court will then appoint another attorney to review this record who will, if willing to represent the mother on appeal, be appointed for this purpose. If the second attorney determines that there is no merit to an appeal, he or she is requested to make this known to the court at the earliest possible moment, and the respondent mother will be informed by the clerk forthwith that she has the balance of the extended time to appeal in which to secure her own counsel who, if qualified, may be appointed to represent her on the appeal. If she does not do so, then upon expiration of the extended appeal period, her right to pursue an appeal will be ended and the termination of her parental rights final. The child will at that time, and not before, be free to be placed in adoption.
If such procedures satisfy the sixth amendment right to counsel in criminal cases (Douglas v. California, 372 U.S. 353
(1963); Fredericks v. Reincke, 152 Conn. 501 (1965), they are even more appropriate where there are interests of a third party involved: Those of the child whose need for permanent safe parenting is entitled to at least as great a degree of consideration as are those of the parent whose right to raise him is at issue. Even unsuccessful appeals delay permanent planning for years since no child may be adopted until the appellate process is exhausted. The need for finality of judgment in cases where the state initiates legal action against indigent respondents, which gave rise to the rule of Douglas and Fredericks, supra, applies as much or more to cases where the person affected by the judgment is a young child for whom the passage of periods of time that may seem short for adults can work changes with lifetime implications.
Entered at Hartford this 14th day of September 1990
Brenneman, Judge