[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
NATURE AND HISTORY OF PROCEEDINGS
William, Sarah and Hannah are the subjects of coterminous petitions which were filed pursuant to subsection (e) of Section17a-112 of the Conn. Gen. Statutes by the Commissioner of the Department of Children and Youth Services (DCYS) on January 10, 1991 for Hannah and January 16, 1991 for William and Sarah. The termination petition was technically amended on June 7, 1991. The petitions allege respectively that the three children are neglected and uncared for, and seek to terminate the parental rights of their parents on the grounds of: (1) failure to rehabilitate as to William and Sarah only, which ground is alleged to have existed for at least one year; and (2) acts of commission or omission as to all three children, which ground is alleged to have existed for less than one year. DCYS is asking the Court, as to the second ground, to waive the requirement CT Page 310 that one year expire prior to the filing of a termination of parental rights petition. On (January 10, 1991, (as to Hannah), and January 24, 1991, (as to William and Sarah), the Petitioner obtained an Order or Temporary Custody under Section46b-129 (b)(2) of the Conn. Gen. Stat. Both parents waived their right to a hearing within ten days on the need for such temporary custody. The temporary custody orders have remained in effect to the present date.
William and Sarah have previously been the subject of proceedings in this Court. On May 6, 1987, William was adjudicated as an uncared for child, and was placed under an order of Protective Supervision for three months, until August 4, 1987, when Protective Supervision was withdrawn. On November 7, 1988, the Petitioner filed a new petition, which resulted in both William, then about two years old, and Sarah, then about four months old, being adjudicated on April 20, 1989 as uncared for, and they were committed for up to eighteen months. On August 28, 1990, the Court extended the commitment to October 20, 1990; on October 12, 1990 the Court granted the Petitioner's oral motion to withdraw the petition for extension of commitment so the commitment expired on October 20, 1990. DCYS closed their case on December 6, 1990, thereby terminating their involvement with the Hirschfeld family.
The trial on these coterminous petitions was held on June 7, 10, 27, 1991; July 8, 11, 1991; August 5, 20, 22, 1991; and September 13, 1991.
The Petitioner called the following witnesses: Christine Diebel, Child Guidance Clinic, Mental Health Counselor for William and Sarah; Diane Page, Parent-Aide, Marilyn Mapes, DCYS Social Worker; Karen Pennell, Foster Mother; Phyllis Wiggins, Head Start Teacher; Diane Fedus, friend of Mother and Father, Robert Young, friend of parents; Darlene Dunbar, DCYS Worker; Kathy Melchior, DCYS Worker, Kathleen Winn, Department of Mental Retardation Early Intervention Program school teacher; Michael Boyd, Norwich Police Officer; Barbara Sizer, DCYS Social Worker Linda Certo, Community Mental Health Case Worker; and Dr. Fernando Stern, Psychiatrist.
Father called the following witnesses: Karen Spaulding, Department of Mental Health; and Ilona Sakalauskas, Therapist at United Community Services. Mother called one witness, Linda Anderson, a Registered Nurse for United Community Services.
PROCEDURE TO BE FOLLOWED.
Where neglect and termination petitions are coterminously filed under Section 17a-112 (e) of the Conn. General Statutes, CT Page 311 the court is required to proceed In three separate stages.
First — Adjudication of The Neglect Petition.
The court must determine, by a fair preponderance of the evidence, if the child has been neglected or uncared for as of the date the petition was filed or last amended, in this case, January 10, 1991 for Hannah, and January 16, 1991 for William and Sarah, If the Petitioner's evidence does not support such a finding, then both petitions must be dismissed since both are based on the same alleged facts. If the court finds the child to have been neglected or uncared for, disposition will be deferred until a decision is rendered on the termination petition.
Second — Adjudication of The Termination Petition.
The court must next determine whether the evidence provides clear and convincing evidence that any pleaded ground exists to terminate the parents' rights, as of January 10, 1991 (Hannah) and January 16, 1991 (William and Sarah). If no such ground is found, the court must return to the neglect petition to consider an appropriate disposition. If at least one ground to terminate is found, the court must move to the third stage.
Third — Disposition of Both Petitions.
If grounds are found to adjudicate the child neglected or uncared for, and to terminate parental rights, the court must then consider whether the facts as of the last day of the hearing, September 13, 1991, establish by clear and convincing evidence, after consideration of the six factors enumerated in Section 17a-112 (d) of the Conn. General Statutes, that such termination is in the child's best interest. If the court does not find that the child's best interests would be served by terminating the parents' rights, it must return to, and dispose of the neglect petition. If the court does find that termination serves the child's best interests, an order should issue terminating the parents' rights.
FACTS
Evidence offered at trial, interpreted in the light of the prior record in this court concerning these children, of which the court has taken judicial notice, permits the finding of the following facts:
Mother has a long history of being retarded and grossly psychotic, and is unable to care for herself, let alone for her children. CT Page 312
Father, who was forty-four years old at the time of trial, has had at least thirteen psychiatric hospitalizations, from the 1970's to date of the Petition, including six in the five years and two months immediately proceeding the filing of these petitions.
On December 25, 1990, the Norwich Police Department was called to the Hrischfeld home at 8:00 A.M. because of a complaint from neighbors. Mother, Father, Edith Boska, who is Father's mother, and the three children were there. Officer Boyd testified that Father, who was holding seven month old Hannah, was incoherent. Since there was no evidence of physical abuse, DCYS was not called. Father's mother told the police that he had become violent, throwing items about the apartment, yelling and screaming, and that he had hit her on the top of her head with his open hand. She also said that his mental condition has worsened in the past ten days and he hadn't eaten in days, causing him to become weak. (See Petitioner's exhibit 16). The police found Father sitting in a living room chair, talking incoherently, saying he was hearing voices. He was hallucinating, and continued talking to himself about seeing God, and said he wanted to commit suicide. When paramedics arrived, he was being escorted to the front door when he attempted to pull away from the police officers. He was then restrained, but suddenly caused his body to go limp. He lay on the floor, refused to get up, and started to scream and wave his arms back and forth violently. He had to be placed in a full length body restraint bag, and was taken first to Backus Memorial Hospital and then to Norwich State Hospital. (Petitioner's Exh. 16).
Father called a friend from Norwich State Hospital, Diane Fedus, and told her that the children were at their apartment with Mother and Edith Boska. He asked Diane Fedus if she would take care of Hannah for a day or two. Shortly thereafter, Mother went to the Hospital and Mrs. Boska took William and Sarah to her house. Father didn't pick up Hannah after a day or two as he had promised. In fact, Father disappeared and no one knew where he was, including his mother and Diane Fedus, who were caring for his children. Approximately two weeks passed and since Diane Fedus still had Hannah and had no idea where Father was, or when he was coming back, she called DCYS. When Father disappeared, his mother refused to take Hannah and frequently told Diane Fedus not to tell DCYS that Father was missing. (Testimony of Diane Fedus).
Kathleen Winn, DMR school teacher in Sarah's early intervention program, testified that Sarah was not in school on January 2, 1991. On January 3, she spoke to Mrs. Boska and visited her home on January 11, 1991. Mrs. Boska told her she CT Page 313 didn't know where Father was or now long he would be gone, and that Mother was in the State Hospital. Ms. Winn went to Mrs. Boska's again on January 15 and then called DCYS because of her concerns about William and Sarah's behavior.
Barbara Sizer, DCYS Social Worker, testified that she visited Mrs. Boska on January 11, 1991, who wasn't able to tell her Father's whereabouts and said she was very concerned because William and Sarah were too much for her. During that visit, Father called from Lincoln Hospital in New York and said he hadn't taken his medication because of the stresses at home. On January 7, 1991, Barbara Sizer had called Father's psychiatrist, Dr. Murthy, who didn't know where he was.
It was at this time that the coterminous petitions were filed and DCYS sought temporary custody of all children, (January 10, 1991 — Hannah, and January 16, 1991 — William and Sarah).
ADJUDICATION — NEGLECT/UNCARED FOR PETITION.
The Petitioner must prove by a fair preponderance of the evidence that the children as of the date of the filing of the Petitions, (January 10, 1991 — Hannah, and January 16, 1991 — William and Sarah) were being denied proper care and attention physically, educationally, emotionally and morally, or their home could not provide the specialized care which their physical, emotional or mental condition required.
Mother is indisputably unable to care for her children by herself. Father, who is able to care for Mother and the children except during those periods when he is experiencing psychiatric decompensation, became seriously ill on December 25, 1990, exhibiting bizarre and what must have been extremely upsetting behavior in front of his children. He had to be forcibly removed from the family home, under restraint, and was hospitalized for several weeks. Even though this had happened regularly in recent years, Father made inadequate provision for the care of his children. His mother and a family friend had to be pressed into service as caretakers on an emergency basis. The children's home was suddenly cut out from under them and they were split up; Hannah went with the family friend and William and Sarah went with their paternal grandmother. Neither caretaker knew where Father was, or how long he would be away, so it was impossible for them to make proper plans for the children's care. These children were ages four, two, and seven months and had daily needs for care and attention which could not be properly arranged for and met by caretakers who were practically forced by the exigencies of Father's illness to take the children, and who had no idea when Father would return or CT Page 314 even where he was or how to reach him in case important information about the children might be needed.
The Court finds that the Petitioner has proved by a fair preponderance of the evidence, that as of January 10, 1991 (Hannah), and January 16, 1991 (William and Sarah), the three children were neglected and uncared for.
The Court must now go on to consideration of the Petition for Termination of Parental Rights.
ADJUDICATION — TERMINATION OF PARENTAL RIGHTS.
The termination of parental rights involves two phases: adjudication and disposition. At first, the Court determines whether one or more statutory grounds have been proved. See e.g., In Re Juvenile Appeal (84-AB), 192 Conn. 254, 262 (1984) In Re Nicolina T.,
9 Conn. App. 598, 602 (1987). A finding that statutory grounds exist must be made by proof of facts existing on the date the petition was filed or amended. In Re Luke G., 40 Conn. Sup. 316,324 (1985). Without such a finding no inquiry may be made as to the ultimate best interest of the child. Id.
The standard of proof mandated by Connecticut General Statutes Section 17a-112 (b) and Practice Book section 1049 is "clear and convincing evidence." This constitutionally mandated standard, Santosky v. Kramer, 455 U.S. 745, 102 S.Ct. 1388,71 L.Ed.2d 599 (1982) has been observed by our courts. See e.g., In Re Juvenile Appeal (84-3), 1 Conn. App. 463 (1984).
Termination of parental rights is "a most serious and sensitive judicial action." Anonymous v. Norton, 168 Conn. 421,430 cert. denied, 423 U.S. 935 (1975). The integrity of the family unit is protected by the Ninth Amendment and the due process and equal protection clauses of the Fourteenth Amendment of the United States Constitution. Stanley v. Illinois,405 U.S. 645, 651, 92 S. CT. 1208 (1972). "The right to family integrity includes `the most essential and basic aspect of familial privacy — the right of the family to remain together without the coercive interference of the awesome power of the state.'" Duchesne v. Sugarman, 566 F.2d 817, 824 (2d Cir. 1977), quoted in In Re Juvenile Appeal (83-CD), 189 Conn. 27
(1983)." The natural right of parents in their children undeniably warrants deference and, absent a powerful countervailing interest, protection." In Re Juvenile Appeal (Anonymous), 177 Conn. 648, 671 (1979). The child as well as the parent has a constitutionally protected interest in the integrity of her family. Santosky v. Kramer, 455 U.S. 75
CT Page 315 (1982).
It is the public policy of this state to preserve the family unit. Before the state may intervene for the purpose of terminating the parents' fundamental liberty interest in the parent-child relationship, the need for such intervention must be compelling. In Re Juvenile Appeal (Anonymous), 177 Conn. 648
(1979). "Since the failure to meet the requisite standard could result in a loss of a fundamental constitutional right the statute must be construed strictly to mean the minimum standard below which there is a substantial risk that the health and well-being of the child will be jeopardized." In Re Juvenile Appeal (83-BC), 189 Conn. 66, 83 (1983). Due process requires that the state prove by clear and convincing evidence that statutory termination criteria have been met. Santosky v. Kramer, supra at 145 (1982); In Re Juvenile Appeal (83-CD), supra.
Since Connecticut General Statutes Section 17a-112 (b) lists the statutory grounds in the disjunctive, the Court need find only one ground to grant the petition. In Re Juvenile Appeal (84-BC), 194 Conn. 252, 258 (:1984); In Re Nicolina T., supra at 602.
In this case the Petitioner alleged the following statutory grounds for termination of parental rights: A. As to William and Sarah, the children have been found in a prior proceeding to have been neglected or uncared for and Mother and Father have failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the children, they could assume a reasonable position in the life of the children, and; B. As to all three children, the children have been denied by reason of an act or acts of commission or omission by the Mother and Father the care, guidance or control necessary for their physical, educational, moral or emotional well-being.
A. FAILURE TO REHABILITATE.
As to the failure to rehabilitate ground for William and Sarah, they were found on April 20, 1989, to have been neglected or uncared for and were committed to DCYS for a period of up to eighteen months. However, just prior to eighteen months from that date, on October 12, 1990, DCYS made an oral motion to the Court to withdraw its petition for extension of the commitment. The Court granted this Motion and noted that the commitments will expire on October 20, 1990.
This court finds that DCYS, by its positive act of formally withdrawing the petition to extend the commitment beyond October CT Page 316 20, 1990, thereby allowing the commitment to expire with court approval on October 20, 1990, and by closing its file completely on December 6, 1990, clearly and unequivocally stated by implication that the reason for commitment no longer existed, and that Mother and Father, as of December 6, 1990, had achieved such a degree of personal rehabilitation as to warrant the belief that Mother and Father were assuming a reasonable position in the life of William and Sarah, and that DCYS involvement was no longer needed. If this were not the case, why did DCYS allow the commitment to expire on October 20, 1990, and why did they close their file on December 6, 1990? They could have asked for Protective Supervision if they felt the home should be monitored but they did not. This finding of the the court is further bolstered by the fact that William and Sarah had been home with their parents since August 27, 1990, three and a half months before DCYS closed its file, and Hannah had been home continuously since her birth on May 25, 1990. DCYS had plenty of time to monitor how the children were doing at home before December 6, 1990, which renders more significant their actions of allowing the commitment to expire on October 20, 1990, and their closing of their file on December 6, 1990, without even a request for Protective Supervision.
This being the case, Father's illness of December 25, 1990, and the events which occurred between then and the filing of the Petition on January 10 and 16, 1991, fall short of reaching the level of proof required, that of clear and convincing evidence that Mother and Father failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the children, they could assure a reasonable position in the lives of William and Sarah. The ground of Failure to Rehabilitate is therefore dismissed.
B. ACTS OF OMISSION OR COMMISSION.
In order to terminate Mother and Father's parental rights on the ground of acts of commission or omission under Section17a-112 (b)(3), the Court must find clearly and convincingly that the child was denied the care, guidance or control necessary for his or her physical, educational, moral or emotional well-being as the result of an act or acts of commission or omission by the parents.
In the Petitioner's Trial Brief. Page 31, last paragraph, the Petitioner acknowledges that "This ground . . . . is based on the circumstances which led to the placement as described in our analysis of the neglect adjudication and of the previous ground of failure to rehabilitate." Those circumstances are that Father became ill on December 25, 1990, left William and Sarah CT Page 317 in the care of his mother, and Hannah in the care of Diane Fedus, a family friend, without keeping them informed of where he was. These petitions were filed sixteen days later (January 10, 1990) in the case of Hannah and twenty-two days later (January 16, 1991) in the case of William and Sarah.
The Court finds that the petitioner has not clearly and convincingly proved that the above described incidents, which took place in a two to three week period, were acts of commission or omission that resulted in any of the children being denied the care, guidance or control necessary for their physical, educational, moral or emotional well-being. There was no substantial testimony, sufficient to sustain the level of proof required for termination of parental rights, that any of the children were deprived of anything necessary for their physical, educational, moral or emotional well-being. There was no evidence at all of any physical harm or abuse. With respect to their education, William and Sarah both attended their pre-school programs and Hannah was too young for any such program. There was no evidence presented relating to their moral well-being. As far as emotional well-being is concerned, there was no substantial evidence elicited that clearly and convincingly proved that an act or acts of commission of omission which DCYS has alleged as a ground for termination, resulted in the denial of the care, guidance or control necessary for their emotional well-being. The second ground is therefore dismissed.
The Court also finds that even if the Failure To Rehabilitate ground or the Act or Acts of Commission or Omission ground had been proved, neither ground existed for at least one year prior to the filing of the petitions, and that there is not a sufficient basis in the record for the Court to find from the totality of the circumstances surrounding each child, that a waiver of the twelve month requirement is necessary to promote the best interest of the child.
The Court finds it appropriate, in the rendering of this decision, to comment that although Mother is clearly and undisputably incapable of caring for her children alone, the facts presented here are of mother and father acting together as one. Mother's handicaps are lovingly compensated for by Father, and and these two parents must be evaluated as the unit that they are. What might be called for if the Mother no longer had Father to depend and lean upon is not an issue in this case.
Inasmuch as both grounds pleaded by the Petitioner for Termination of Parental Rights have been dismissed, the Court must return to the Neglect/Uncared For Petition to consider an appropriate disposition. CT Page 318
DISPOSITION OF NEGLECT/UNCARED FOR PETITION
A. Facts Found Relating To Disposition.
In the dispositive phase of this Petition, the Court must consider facts as of September 13, 1991, the final date of the trial. The Court finds the following facts:
Christine Diebel, Mental Health Counselor with the Child Guidance Clinic has been William and Sarah's therapist since April 3. 1991. She testified that both children acted well with Father and he was very appropriate with them, that they both love him and want to live with him, that Sarah and William are very close to each other, and that although Sarah has serious developmental delays, genetic factors could be the cause of the delays, although not the sole cause.
During the period of June 18, 1990 to October 30, 1990, Father was terrific with the kids, hugged them, was gentle with them, did activities with them, was very good with feeding and nutrition, and the apartment and children were immaculate. Shortly after October 26, 1990, Diane Page, Parent Aide, spoke to Father's psychiatrist, Dr. Murthy, who said he was seeing Father, she told Father that Sarah was a little slow and that he said she might be tongue tied. After a one day surgical intervention on her tongue September 14, 1990, Sarah's speech improved.
(Testimony of Diane Page)
On June 10, 1991, Marilyn Mapes, DCYS Social Worker, testified that over the past several months, she saw Father about four times, that he looks fine and the children were affectionate toward him. Ms. Mapes also testified that Sarah's delays were birth related, because she was less than one month old when first placed.
Diane Fedus, family friend of the parents, who had lived with Mother and William (child) when he was about six months old, and who had taken care of Hannah from December 25, 1990 to January 10 1991, testified on June 27, 1991 that she had no concerns about the children returning home.
From testimony of Robert Young, family friend, on July 8, 1991, who saw Father once or twice a week over past six months, Father's home was excellent, clean; he shows great affection to all children, knows how to care for them, can handle them perfectly and has been able to, since about February 1, 1991; Father is taking medication, and sees his psychiatrist once a CT Page 319 week. There are no signs of decompensation; he's a good father, loves his children; Mother has improved, can bathe and change the baby. Mr. Young will help the family if needed, when he's not working.
On July 11, 1991, Barbara Sizer, DCYS Social Worker testified that both William and Sarah are strongly bonded to Father and that Hannah is comfortable with her parents, that Father has consistently visited his children since March 1991 and has said he wants them back, that William has told her four or five times that he wants to go home; he identifies very strongly with his father.
Dr. Fernando Stern, court appointed psychiatrist, in his report dated May 10, 1991, in the next to last paragraph on Page 4, stated:
"I still believe that he is perfectly able to care for his children. It is his frequent psychiatric decompensations that are of concern to me." On Page 3 of this report, next to last paragraph, Dr. Stern states that "I also had the opportunity to discuss this case with Dr. Murthy, treating psychiatrist for Mr. Hirschfeld, who believe he is getting an enormous amount of intensive psychiatric care. Dr. Murthy believes this intense treatment may prevent further decompensations, and if these decompensations occur, they may be short-lived and increasingly infrequent. Although I do not disagree with Dr. Murthy in this area, I should reiterate that someone suffering this type of chronic psychiatric condition may decompensate in spite of the test and closest psychiatric care." (Petitioner's Exhibit 26).
Dr. Murthy's letter to Mr. Hirschfeld's attorney, dated April 4, 1991, which is Petitioner's Exhibit 27, states that . . . "I believe that in Mr. Hirschfeld's case the chances of decompensation are minimal if he continues to comply with treatment. The current treatment plan is weekly visits with me; (2) weekly visits by case manager, Karen Spaulding, at home; (3) Twice a week with visiting nurse, L. Anderson, R.N. and I. Sakilowsky, R.N., at home; (4) Twice a week with Home Health Aide at home."
Karen Spaulding, who was referred to in Dr. Murthy's report, testified on August 22, 1991 that she sees Father every ten days or two weeks, or more often if he asks for help, that he sees Dr. Murthy every week, that he feels better because his blood pressure is under contract, that he's been stable and steady since January 1991, and that with adjustment in medication, Mother is holding up very will, and that in the past two months she's seen Father about once a month. CT Page 320
Linda Anderson, R.N. also referred to in Dr. Murthy's report, has been helping Mother since October 15, 1990, about once a week. She is not Father's primary caregiver, but since Mother's welfare depends on Father, she gives him services also. In last six months (prior to August 22, 1991) Mother has blossomed, is improving and works well with Home Health Aide. Ms. Anderson is going to continue services and would be available any time Monday through Friday. (Testimony of Linda Anderson)
Ilona Sakalauskas, Therapist at United Community Services, also mentioned in Dr. Murthy's report, testified on August 22, and September 13, 1991, that she goes to Father's home once a week' that his blood pressure has been normal for several months, he's taking his medication, is very comfortable and relaxed, is improving significantly, and works well with the support team. She keeps in touch with Linda Anderson, and is part of a team of various community agencies that provide services to the family.
As a result of finding the above dispositional facts, the Court finds that the Hirschfeld family loves and needs one another, that Mother and Father are both doing well, that they are following Dr. Murthy's recommendations in order to lessen the chances of Father's decompensation, and that it is the best interests of the children to be reunited with their parents and with each other. At the same time, the Court finds that it would also be in the best interests of the children to be under the protective supervision of DCYS so that appropriate support and monitoring services can be provided.
The Court therefore orders that William, Sarah and Hannah Hirschfeld be returned home to their parents and placed under the Protective Supervision of DCYS for a period of one year, beginning on the day this Decision is filed in Court, and further orders an in-court review of the Protective Supervision on or before August 1, 1992.
RICHARD A. WALSH, J.