MEMORANDUM OF DECISION
This case presents a petition for the termination of the parental rights of Henry and Della A. to their child. Tiffany, now age three. Tiffany was placed with the Department of Children and Families (hereinafter DCF) on March 27, 1995, six weeks after her birth on February 2, 1995, due to concerns over the parenting abilities of father and mother. On November 14, 1995, Tiffany was adjudicated an uncared-for child and committed to the care and custody of DCF. Extensions of commitment were approved in 1996 and 1997. On May 2, 1997, DCF filed a petition for termination of parental rights of the biological parents.
The court finds that the mother and father were served with the petition for termination and have appeared through court-appointed attorneys. The court has jurisdiction in this matter; there is no pending action affecting the custody of Tiffany in any other court.
At trial, DCF proceeded against both parents on the ground that the child was previously adjudicated uncared-for and that the parents had failed to rehabilitate. General Statutes §17a-112 (c)(3)(B). Both parents contested the allegations against them.
FACTS
The court, having read the verified petition, the social studies, and the various documents entered into evidence, and having heard the testimony of the witnesses, and Dr. Karen Alexander, a court-appointed psychologist, as well as having taken judicial notice of the prior record in this court, makes the following factual findings and reasonable inferences supported by these facts. CT Page 5691
Prior to giving birth to Tiffany, mother was addicted to cocaine and was also diagnosed as mentally ill. One aspect of this illness is mother's shy, passive personality. At the time of Tiffany's birth, mother was twenty-seven years old. Father, sixty-seven years of age, at the birth of Tiffany, has arthritis, hearing loss, and virtual blindness. Tiffany was born prematurely and was under-weight. Mother controls her mental illness through chemical injections, and Tiffany had this chemical in her blood at birth. She also suffered from a pulmonary problem when born.
Doctors recommended that Tiffany stay in the hospital at birth because of her low birth weight. During this time, the parents attempted to care for the child. Hospital officials became concerned that the parents were unable to care for Tiffany properly; based on reports from the hospital, Catholic Family Services and DCF's own observations, a ninety-six hour hold was invoked, an OTC was obtained and Tiffany was placed in foster care as uncared-for. The parents entered a plea of nolo contendere to the uncared-for petition on November 14, 1995.
Expectations were entered into at that time. These expectations included visitation, parenting counseling, Della's attending an aftercare program for her mental illness and taking her medicine, having a parent counselor and aide, no substance abuse, and no smoking in the house or around Tiffany.
DCF provided services under these expectations at once. Sandra Gold, a parent aide supervisor and MSW testified that the services provided by DCF were the most she had seen in any case. Until July, 1996, DCF arranged visitation at the parents' home twice weekly for a total of six hours. A home based counselor provided parenting skills education for two hours a week. A parent aide provided education for three hours a week. After July, 1996, there were reduced hours of visitation (one hour on Tuesday and three hours on Thursday) and father filed a motion to compel further visitation and other services. On April 4, 1997, the court (Dennis, J.) ordered two visits per week of two hours each, and these took place. The parent aide continued until November, 1996. Elaine Phillips from Family and Children's Aid has remained involved with the parents and has counseled them, most recently on dealing with the pending TPR proceeding. There have also been team meetings of DCF workers and service providers to resolve problems of services, which the parents attended. There were various suggestions raised by father at the team CT Page 5692 meetings which were addressed by the assembled team. The court concludes factually that these were reasonable efforts and that there was no further duty for DCF to engage full-time, around-the-clock, help in the home.
There is no question that father and mother attempted to meet the expectations that were set and took advantage of the services offered by DCF. The problem is that witnesses who have reviewed the situation at the time of Tiffany's birth in February, 1995, at the time of the filing of the TPR petition in May, 1997, and even at the present time, have concluded that the parents were, and continue to be, unable to meet the standards required for assuming their parental roles. These witnesses have had many years of experience in child-rearing and the court must give deference to their views.
DCF social worker, Linda Maxwell, with whom the parents related well, testified that in her period of contact in 1995 and 1996, the home was not child-proof. There were pennies and matches left on the floor of the living room. The cigarette smoking did not take place in the apartment, only on a balcony, but was frequent, and was clearly in the atmosphere of the apartment. Since Tiffany has a pulmonary condition, second-hand smoking is a health issue for her. Further, Maxwell did not believe that mother was a good "watcher" as the child crawled around. Mother was often engaged in meeting father's needs. Maxwell concluded that a surrogate parent was the only solution to the parents' difficulties.
Linda Nasser, a DCF supervisor, was asked to monitor a visit at the offices of DCF in Danbury on December 30, 1997. This visit was to last two hours. It was terminated after forty minutes. Tiffany would approach father and play with his small tape recorder and then retreat. Father took two cigarette breaks in a one-half hour period. Mother slept throughout the visit, apparently ill with a headache.
Michael Cleary, now a social worker for DCF, and between May, 1997, and January, 1998, a social worker assistant at DCF, spoke about driving Tiffany to the visits with father and mother from the foster home. Tiffany has an excellent relationship with the foster family. At times she was reluctant to travel to mother and father's home and, one time, had a temper tantrum. Mr. Cleary also noticed the number of cigarette breaks father took during the visits. He concluded that visitation in his opinion could CT Page 5693 never be unsupervised.
Sandra Gold, as indicated, a parent-aide supervisor, stated that some progress by father and mother in parenting skills had been made from the time of the OTC until Ms. Gold's departure in November, 1996. The progress was, however, minimal. As an example of poor supervision, she cited her last visit in November, 1996, where father was attempting to care for Tiffany alone, as mother was out of the house. Tiffany accompanied father into the kitchen where lunch was being prepared, reached into a lower cabinet and took out some nails which had been left there. As father has almost full vision impairment, this incident would have led to injury to Tiffany had 8Ms. Gold not stepped in and taken the nails away. Ms. Gold testified that mother had the desire to care for Tiffany and treat her appropriately, but she did not have the ability to follow through on tasks.
Diana Jones, the home-based parent counselor in 1995 and 1996, worked hard on all issues with father and mother. Neither parent could transfer the information learned at the training sessions to their interaction with Tiffany. Jones also points to the lack of child-proofing in the kitchen and the living room. She felt that father was caught up in his own world and not responsive to Tiffany.
The parents' witnesses did not contradict the petitioner's witnesses. Elaine Phillips, who currently meets with father and mother for parental counseling, stated that she could make no judgment on their parenting abilities. Edith Saunders, a psychiatric nurse, testified that mother is a model patient regarding treatments for chemical dependency and her psychiatric illness. She, too, could offer no opinion on mother's parenting abilities. She did remark, however, that mother's illness limits her spontaneous reactions to incidents. This is, of course, a significant deficit in raising a child.
Respondent mother testified that she would call upon her own mother for assistance, if the child were returned to her and husband. Dolly L., Della's mother, testified, however, that she was going to be married again in September, 1998, and would eventually leave the state for Alabama. This remarriage also limited a DCF suggestion in 1996 that Dolly L. stay overnight in the parent's home, assisting with the parent's supervision of Tiffany. Because Dolly L. has commitments to her intended life partner, this overnight visit never happened. CT Page 5694
Dr. Karen Alexander, who conducted two court-ordered evaluations (Exhibits 3 and 4), testified as an expert in child and clinical psychology. Dr. Alexander, a psychologist, met with the parents on April 28, 1995, and on May 19, 1997. Her conclusion in May, 1997, was that, while parental training had been offered by DCF for several years, father and mother had not developed the parental skills to raise Tiffany. She also similarly concluded in both her reports that the respondent parents would require a full-time, live-in supervisor before Tiffany could be returned to them.
During the second evaluation in May, 1997, Dr. Alexander observed the bonding between the foster mother and Tiffany. She also saw that Tiffany was avoidant of father and mother. She also observed that father and mother have their own issues to deal with, such as father's vision handicap and mother's continuing flat, submissive personality, and that Tiffany would not be able to fit comfortably into this situation. Mother could not serve as a true "mom" to her daughter. One example of disfunction occurring during this observation was when father offered Tiffany candy when he did not have any. This teasing behavior could only confuse and annoy a young child. Dr. Alexander found that the DCF driver, Michael Cleary, had more of a bond to Tiffany than did father or mother. Dr. Alexander could not set a date into the future when father and mother's situation would have improved so that their role as parents might be restored.
Tiffany is now with a foster family, has bonded with that family, and is a healthy and active toddler. She has been in foster placement for three years. This is a stable environment and DCF is looking to have permanency planning commence.
ADJUDICATION
The court finds by clear and convincing evidence existing at the time of the filing of the petition to terminate parental rights (May, 1997) that DCF had used reasonable efforts to re-unify Tiffany with her biological parents. This is based upon the facts found above detailing the services which DCF sought to provide to mother and father.[2]
The court also finds by clear and convincing evidence at the time of the filing of the TPR petition that petitioner, DCF, must prevail against mother and father on the ground of General CT Page 5695 Statutes § 17a-112 (c)(3)(B), failure to rehabilitate. Tiffany was found to be uncared-for in a prior proceeding, and, at the time of the termination proceeding, the biological parents had failed to achieve such a degree of personal rehabilitation as would encourage the belief that within a reasonable time, they could assume a responsible position in Tiffany's life.
In making this decision, the court does not in any way cast blame or find fault with the parents, who have tried to remedy their situations, but cannot do so at the present time or in the foreseeable future. "Personal rehabilitation" as required by subsection (3)(B) of Section 17a-112 (c) means that father and mother restore themselves "to his or her former constructive anduseful role as a parent." In re Migdalia M., 6 Conn. App. 194,203, 504 A.2d 532 (1986). In the case of In re: Juvenile Appeal,(83-BC), 189 Conn. 66, 78-79, 454 A.2d 1262 (1983) the court indicated that "the legislature may properly strike the balance at the point where mental or physical deficiency, even though not involving fault, is so great as to render the parent incapable of measuring up to the child's needs as those are delineated in [§ 17a-112]." The court also finds that the facts warranting adjudication have existed for more than one year prior to the filing of the petition.
REQUIRED FINDINGS
The court makes the following factual findings required by General Statutes § 17a-112 (e):
1. Appropriate and timely services were provided to mother and father by DCF, including psychological counseling, transportation assistance, parenting counseling, parental homemaking and visitation coordination. The specifics of the assistance are discussed above. The court has found that DCF took an extensive amount of time with mother and father and supplied them with numerous services.
2. The court finds that DCF made reasonable efforts to reunify the biological parents with Tiffany over the past three years, given the situation and circumstances as discussed above.
3. DCF, with the approval of the court, set reasonable and realistic expectations in order to reunify the family. Mother and father attempted to comply with the expectations. Some of the specific expectations were minimally met: visitation with Tiffany CT Page 5696 occurred, the cigarette smoking was curtailed in the apartment itself, mother received her medication and did not abuse substances, father and mother attended counseling faithfully and, in good faith, desire reunification. On the other hand there was no improvement beyond this minimal level. The visits were largely unsuccessful, the cigarette smoking still took place in great volume in the general proximity of a child inflicted with a lung disease, and the parenting classes did not lead to the parents being better supervisors of their daughter.
4. Tiffany has strong emotional ties with her foster family and few ties with the biological parents.
5. Tiffany is three years old. She requires stability of placement and continuity of care. The attorney for the child recommends termination. Our Supreme Court has long recognized the deleterious effect of prolonged temporary care of children such as Tiffany. In re Juvenile Appeal (83-CD), 189 Conn. 276 (1983). The Appellate Court has also correctly noted, "[because of the psychological effects of prolonged termination proceedings on young children, time is of the essence. . . ." Alexander V.25 Conn. App. 741, 748, 596 A.2d 930 (1991).
6. The parents were not able, because of their individual handicaps and their disabilities taken together, to make a sustained effort to conform their conduct to acceptable parental standards. Giving them additional time would not likely bring their performance as parents within acceptable standards to make it in the best interests of the child to be reunited. In re LuisC., 210 Conn. 157 (1989); In re Juvenile Appeal, 183 Conn. 11, 15
(1981). The court's conclusion on disposition is based, in part, upon the nature of the contacts maintained between the biological parents and Tiffany, generally unsuccessful, and the foster parents' contacts with Tiffany, where bonding has occurred.
7. While the parents means were limited, economic factors did not prevent regular, continuing contact with Tiffany or the foster parents. All parties lived in reasonable geographic proximity. DCF encouraged contact between mother, father and the child and provided services in light of biological parents' financial status. No unreasonable conduct by DCF occurred; indeed testimony indicates that DCF acted quite reasonably under the circumstances of this case.
DISPOSITION
CT Page 5697
Dr. Alexander has properly summarized this case as follows, and it guides the court's approach to the matter on disposition:
 Each of these adults [biological father and mother] brings to the parenting situation many real limitations that do not cancel each other out. When one considers their individual strengths combined, even these do not add up to one functioning parent. It is recommended, therefore, that Tiffany not be placed with them in the immediate future, and perhaps ever, because their ability to care for her on a long term basis seems unlikely. This does not mean that Tiffany should be deprived of knowing who her parents are, but it appears that permanency planning needs to be strongly considered. [Exhibit 3 at 9] (emphasis added).
The court finds, based on the above recommendation and the other testimony and evidence presented, that it would be in the child's best interest to terminate the parental rights of mother and father at this time. This finding is made after considering Tiffany's sense of time, her need for a secure and permanent environment, the relationship Tiffany has with her foster parents, and, in the totality of circumstances, that the termination of parental rights is in her best interest.
Termination of parental rights is not ordered as punishment for these parents, who have tried to rehabilitate; it is ordered so as not to punish a child by denying her a safe permanent home with proven competent caretakers because her biological parents have tried hard but continue to be incapable of providing such a home for her.
ORDER
Based upon the foregoing findings, the court concludes that it is in the best interest of the child to terminate the parental rights of mother and father. It is accordingly ORDERED that the parental rights of Della and Henry A. are hereby terminated. The Commissioner of DCF is hereby appointed the statutory parent. A permanency plan shall be submitted within ninety days. A review Plan for Terminated Child shall be filed in accordance with state and federal law.
HENRY S. COHN, JUDGE CT Page 5698
[2] In addition on October 7, 1997 Judge Resha found that further attempts to reunify were not appropriate. This decision was made without prejudice to the date of the hearing on the TPR.See General Statutes § 17a-112 (c)(1) referring to General Statutes § 17a-110 (b).